# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**GEORGE M. PLEWS**
**TODD G. RELUE**
Plews Shadley Racher & Braun
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**N. REED SILLIMAN**
**KAREN T. MOSES**
Faegre Baker Daniels LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DANA COMPANIES, LLC, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 92A03-1208-CC-358 |
| | ) | |
| CHAFFEE RENTALS, a/k/a, CHAFFEE | ) | |
| RENTALS AND STORAGE, BRC RUBBER | ) | |
| GROUP, INC., CHARLES V. CHAFFEE, | ) | |
| KAREN J. CHAFFEE and CLIFFORD | ) | |
| CHAFFEE | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

**FILED**
Dec 19 2013, 7:17 am

**CLERK**
of the supreme court,
court of appeals and
tax court

APPEAL FROM THE WHITLEY CIRCUIT COURT
The Honorable James R. Heuer, Judge
Cause No. 92C01-0602-CC-92

**December 19, 2013**

**MEMORANDUM DECISION - FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

Dana Companies, LLC, ("Dana") appeals their damages awarded in their lawsuit against Chaffee Rentals, Charles V. Chaffee, Karen J. Chaffee, Clifford Chaffee, and BRC Rubber Group, Inc., (collectively, "BRC"). On cross-appeal, BRC claims that the trial court's findings do not support its judgment and that Dana should not recover any damages.

We affirm in part, reverse in part, and remand.

ISSUES

1. Whether the trial court properly determined that the fortuity principle did not apply to Dana's claim.

2. Whether Dana is entitled to recover any damages from BRC in light of their negotiated settlement agreement.

3. Whether Dana is entitled to prejudgment interest.

FACTS

Dana is in the business of manufacturing and engineering parts for the automotive industry. From 1963 through 1983, Dana occupied a plant ("the Plant") located in Churubusco, Indiana. As a part of their manufacturing process and general plant operations, Dana generated hazardous waste. Thus, Dana was subject to regulations issued by the Environmental Protection Agency ("EPA") under the Hazardous Waste and Consolidated Permit Regulations of the Resource Conservation and Recovery Act ("RCRA").[1] In November 1980, Dana submitted an application to the EPA for a Part A

---

[1] Passed on October 21, 1976, RCRA is the primary law used by the EPA to regulate the disposal of solid and hazardous waste.

permit that would allow them to treat and store hazardous waste at the Plant. Dana did not complete subsequent application requirements in a timely manner. As a result, the EPA brought an action against Dana. The EPA and Dana entered into a consent agreement that allowed Dana to operate as if it had acquired interim status.[2] The EPA further required Dana to comply with all permitted and interim status regulations under RCRA. As Dana became more familiar with the requirements of compliance with RCRA, the company believed that RCRA did not apply to its activities at the Plant. In January of 1984, Dana notified the State of Indiana that it had ceased operations at the Plant. In April of 1985, the State of Indiana notified Dana that it had to submit a closure plan for the Plant. Instead, Dana sold the Plant to Chaffee Rentals in May of 1985, who in turn, rented the property to BRC. At the time of the sale, Dana did not tell BRC that the property was under EPA supervision.

BRC manufactures rubber seals and other rubber parts for automobiles. Shortly after BRC began operations at the facility, the local water treatment company discovered elevated levels of polychlorinated biphenyls ("PCBs") that was traced back to BRC's facility.[3] None of the manufacturing processes used by BRC included or produced PCBs.

---

[2]   [The] EPA recognized that it would be impossible for the Agency and authorized states to issue permits to all hazardous waste management facilities before the RCRA Subtitle C program became effective in November 1980. In RCRA § 3005(e), Congress established provisions to treat certain facilities as though they had been issued a permit until final administrative action was taken on their permit applications. This statutory grant of a permit is referred to as "interim status."

ENVTL. PROT. AGENCY, INTRODUCTION TO PERMITS AND INTERIM STATUS (2005).

[3]   PCBs belong to a broad family of man-made organic chemicals known as chlorinated hydrocarbons. PCBs were domestically manufactured from 1929 until their manufacture was banned in 1979. They have a range of toxicity and vary in consistency from thin,

The Indiana Department of Environmental Management ("IDEM") conducted an investigation. IDEM collected sediment, soil, and water samples to identify the source of the PCBs. The results of IDEM's testing showed elevated PCB levels at the Plant.

Dana was notified of the findings, and its investigation confirmed the findings of IDEM. Dana also determined that the cause of the contamination was a heat transfer fluid used between 1964 and 1972 to heat rubber injection presses. Thereafter, with IDEM's knowledge, Dana conducted extensive remediation activities at the Plant and other affected areas from July 1986 to March of 1988. Having been responsible for the PCB contamination, Dana paid all of the costs of remediation. After Dana completed its work, IDEM prepared an agreement that would serve as a settlement of the PCB contamination. However, the agreement was never executed by Dana or IDEM.

On September 12, 1988, IDEM sent a violation letter to BRC directing it to submit a revised part A application or to comply with interim status requirements. BRC responded that the violation was improperly directed at them, as Dana was the original applicant on the Part A application. In March of 1990, the EPA issued a complaint and a compliance order to BRC directing them to cease all hazardous waste operations, comply with all permit application procedures, or submit an appropriate closure plan for those areas of the plant treating hazardous waste. In turn, BRC filed a lawsuit against Dana in

---

light-colored liquids to yellow or black waxy solids. Due to their non-flammability, chemical stability, high boiling point, and electrical insulating properties, PCBs were used in hundreds of industrial and commercial applications including electrical, heat transfer, and hydraulic equipment; as plasticizers in paints, plastics, and rubber products; in pigments, dyes, and carbonless copy paper; and many other industrial applications.

*Polychlorinated Biphenyls (PCBs)*, http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/about.htm (last visited October 23, 2013).

October of 1991, seeking indemnity from the EPA action and possible sanctions. As a part of the EPA investigation, a visual site inspection ("VSI") began on May 6, 1992. Before the inspection was completed, Dana and BRC entered into a settlement agreement resolving BRC's lawsuit and the EPA administrative actions. The agreement, in relevant part, provided:

## AGREEMENT

In exchange for good and valuable consideration recited herein, the receipt of which is acknowledged, it is hereby agreed:

1. Dana indemnifies BRC Parties from all liability, incurred after the date of this agreement, that they may suffer as a result of judgments or settlements against them in the administrative or civil actions identified above and in any subsequent administrative, civil or criminal action brought against BRC Parties arising out of or relating solely to Dana's alleged treatment, storage or disposal of hazardous waste or hazardous substances at the Plant. Such indemnity shall include, without limitation, indemnity from penalties, closure, corrective action, disposal and cleanup activities, and shall continue in full force and effect until June 1, 2007.

2. BRC Parties agree to notify Dana in writing, by certified mail, return receipt requested, at its address as stated in this Agreement, within 20 days of receipt of an action specified in paragraph 1 giving rise to an indemnity claim. BRC Parties agree to allow Dana full control over the defense, including without limitation the compromise or settlement of any matter in which BRC Parties may claim as covered by this Agreement. Dana agrees to keep BRC Parties fully informed about the defense, including but not limited to compromise and settlement.

3. Dana agrees to assume BRC Parties' defense in the pending EPA administrative proceeding, In the Matters of Dana Corporation-Victor Products and BRC Rubber Group, Docket Nos. V-W-90-R-14 and V-W-90-R-15 on the date of execution of this Agreement. For this pending claim and for any subsequent claim on which BRC Parties seeks indemnification, Dana shall have the right to defend BRC and to select counsel of its choice. Except for the pending EPA administrative proceeding specified above, Dana shall not have the obligation to defend BRC Parties on any claims in which the scope of indemnification is in dispute. BRC Parties agree to

5

waive any conflict of interest which such counsel may have in accepting such representation, or to which such counsel may later become subject to by said representation.

4. BRC Parties shall hold Dana harmless for, and the extent of Dana's indemnification under this Agreement shall not extend to, any claims for violations, fines, pollution, remediation work, contaminations, natural resource damage, personal injury or property damage arising out of acts, conduct or omissions at the Plant since May 21, 1985, unless such claims arise out of Dana's alleged treatment, storage, or disposal of hazardous waste or hazardous substances activities at the Plant.

* * * *

8. Dana and BRC Parties and their attorneys shall keep strictly confidential the existence and terms of this Agreement and shall not disclose the existence or terms of this Agreement, unless expressly required by law or required to fully enforce this Agreement. In addition, BRC parties may disclose the existence and terms of this Agreement to prospective purchasers of the Plant upon 48 hours advance notice to Dana and after execution by the prospective purchaser of a confidentiality agreement prohibiting the disclosure of the existence or terms of this Agreement.

(Ex. Index, Vol. III, Ex. 5). Dana and BRC executed the settlement agreement in early August 1992. The EPA concluded its VSI and issued its report in October of 1992. The report identified twenty-nine (29) solid waste management units ("SWMU") and six areas of concern ("AOC") which the EPA recommended for further investigation and possible remediation.

On June 22, 1994, the administrative law judge ("ALJ") in the original action brought by the EPA against Dana and BRC issued a ruling on Dana's and BRC's motions for summary judgment and the EPA's motion for an accelerated decision against Dana and BRC. As to BRC, the ALJ found that BRC had no knowledge of the Plant's interim status at the time it acquired the Plant and that "BRC has not conducted any operations at

6

the facility in violation of RCRA." (Ex. Index, Vol III, Ex. 7). As to Dana, the ALJ found Dana liable for violation of the applicable statutes and regulations. However, the civil penalty that Dana was required to pay was disputed and was not resolved under the accelerated decision.

In August of 1996, BRC contacted Dana and requested that Dana investigate the areas that the EPA recommended for further action in the VSI. Dana replied that while it intended to "abide by the terms of the Settlement Agreement . . . ," Dana had no obligation to indemnify BRC unless an administrative action was brought against it. (Ex. Index, Vol III, Ex. 13). As a result, BRC decided to apply to IDEM's voluntary remediation program ("VRP").[4] BRC invited Dana to participate as well; Dana refused, stating it did not believe participation in the program would reduce the possibility of subsequent action by IDEM. IDEM accepted BRC into the remediation program. During the preliminary stages of the VRP, IDEM project manager Andrea Robertson Habeck ("Habeck") learned from a contact at BRC that an agreement existed requiring Dana to indemnify BRC if an enforcement action arose.[5] BRC hired a firm to take samples at the plant and develop an analysis plan. The cost to BRC was over $65,000. BRC failed to meet the additional requirements of the VRP and was withdrawn by IDEM in July of 1999.

---

[4] The Voluntary Remediation Program was created by statute "to provide an alternative procedure to assure compliance with the law and to encourage the voluntary remediation of hazardous substances and petroleum." Ind. Code § 13-25-5-1.

[5] At trial, Habeck testified that either Mr. Chaffee (not clarifying if it was Charles or Clifford Chaffee), Tom Maher, or Marty Gaughan, both employees of BRC, informed her of the existence of the agreement.

In April of 2000, IDEM issued a Notice of Violation ("NOV") to BRC because of the level of PCB contamination at the site and the fact that BRC did not comply with the requirements of the VRP. Pursuant to the negotiated settlement agreement, BRC sought indemnification and submitted the NOV to Dana. Dana took over the resolution of the NOV and negotiated an agreement with IDEM. The Agreed Order required further investigation and, if necessary, remediation of the same areas identified by the EPA's 1992 VSI. The Agreed Order was signed by representatives of Dana and BRC; it was approved by IDEM on March 24, 2003. Dana retained RMT Inc. ("RMT") to perform the work required by the Agreed Order. Dana spent a total of $640,579.30 in performing the required work. Dana instructed RMT to allocate the costs of the work between Dana and BRC. Where PCB contamination was found, RMT allocated all of the costs to Dana. Where no contamination was found and both BRC and Dana used a particular area, the allocations of costs were equally split between the two. RMT allocated the cost of remediating the trash burning area and the underground storage tanks entirely to BRC. Dana claimed that it never used the trash burning area in its operations. It further claimed that the cost associated with the storage tanks should have been allocated to BRC because it assumed the ownership of the tanks when purchasing the property.

Dana finished the remediation work in 2005 and, on March 16, 2005, submitted a letter to BRC demanding reimbursement for a portion of the costs incurred. BRC did not pay any of the fees Dana demanded, claiming that the Settlement Agreement required Dana to indemnify BRC for the costs. In February 2006, Dana filed a complaint against BRC for breach of the Settlement Agreement. Dana filed an amended complaint in April

8

of 2009 adding claims under the Environmental Legal Act (Ind. Code § 13-30-9-1) and for unjust enrichment. Dana filed a second amended complaint in October of 2010, modifying the amount of damages sought from $189,000 to $1,016,286.91.

The case was heard by bench trial on February 9, 10, and 11, 2011. Considering the facts and evidence submitted, the trial court made the following Conclusions of Law:

1. In August 1992, Dana and BRC executed a Settlement Agreement ("the Agreement") to resolve any disputes between them regarding the liability and damages associated with the EPA actions and BRC's purchase of the property on April 8, 1985. The Agreement is the sole basis for a recovery by Dana against BRC. The other theories propounded by Dana are inapplicable.

2. In the Agreement, Dana undertook an indemnity obligation in Section 1 for "subsequent administrative, civil[,] or criminal action."

3. Dana's failure to obtain a closure letter terminating RCRA oversight and its release of hazardous materials at the plant caused the application of Paragraph 1 of the Agreement to be effective.

4. BRC was fully aware that withdrawal from the VRP program would create a red flag causing corrective action and remediation activity to be required by IDEM.

5. While withdrawal from the VRP was a prudent business decision by BRC to accelerate the resolution of environmental issues affecting the plant, the decision also caused the application of Paragraph 4 of the Agreement to become effective to the extent that any remediation activity required by IDEM resulted from BRC's conduct subsequent to May 21, 1985, would be BRC's responsibility.

6. The allocation of 100% to BRC of the costs associated with SWMU 4 is reasonable and correct. As to SWMU 2, SWMU 14, SWMU 26, SWMU 27, AOC "C", AOC "E", and AOC "F"[,] the activities of the parties before and after May 21, 1985 are intertwined to the extent that a 50% allocation to BRC is reasonable and correct.

9

7. Based upon these allocations, Dana is entitled to recover from BRC $73,294.69 for investigation and remediation work performed at the plant.

8. In the terms of the indemnification provisions of the Agreement, the Court sees no distinction between the cost for investigation and remediation and the cost for administration incurred by Dana in connection with the NOV. $73,294.69 represents 17.73% of the total sum expended by Dana for investigation and remediation. Therefore, Dana is entitled to recover 17.73% of the administrative cost from BRC or $40,291.78.

9. Pursuant to Paragraph 4 of the Agreement, Dana is entitled to indemnification in the total sum of $113,586.47.

10. Dana made a demand for payment (of a greater sum) on March 16, 2005, nearly seven years ago. To date, BRC has maintained that nothing is owed to Dana. An award of prejudgment interest at 8.0% is appropriate. However, the period may not exceed 48 months.

11. Prejudgment interest is computed as follows:

   a. Year one: $9,086.92

   b. Year two: $9,813.87

   c. Year three: $10,598.98

   d. Year four: $11,466.90

   **Total:       $40,946.67**

12. There shall be no award of attorney fees.

(App. 41).

On February 29, 2012, BRC filed a motion to correct error alleging that the trial court's conclusions were not supported by its factual findings. The court denied BRC's

10

motion but decided, s*ua sponte*, that the award of prejudgment interest was in error. The trial court removed the added prejudgment interest from the award of damages.

DECISION

Dana and BRC, through its cross-appeal, essentially claim that the trial court's judgment is not supported by its findings. Specifically, Dana claims that the findings do not support the judgment because: (1) BRC breached the settlement agreement; (2) the trial court misinterpreted the settlement agreement; and (3) BRC's indemnification claim was not fortuitous. Dana also claims that the trial court erred in not awarding prejudgment interest.

BRC, on the other hand, argues that because the trial court found that Dana was responsible for the PCB contamination and failed to properly close the area as required by RCRA, the trial court cannot also find BRC responsible for any of the remediation work done by Dana. BRC claims that in apportioning liability to them, the trial court expanded the terms of the settlement agreement.

The trial court entered findings of fact and conclusions of law. The record shows that while there was a discussion between the court and parties regarding the submission of materials prior to its ruling, neither party made a written request for findings of fact or conclusions thereon. Accordingly, our standard of review is as follows:

> Where the trial court enters specific findings *sua sponte* . . . the specific findings control our review and the judgment only as to the issues those specific findings cover. Where there are no specific findings, a general judgment standard applies and we may affirm on any legal theory supported by the evidence adduced at trial.

*Argonaut Ins. Co. v. Jones*, 953 N.E.2d 608, 614 (Ind. Ct. App. 2011), *trans. denied*.

11

> We apply the following two-tier standard of review to sua sponte findings and conclusions: whether the evidence supports the findings, and whether the findings support the judgment. Findings and conclusions will be set aside only if they are clearly erroneous, that is, when the record contains no facts or inferences supporting them. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. We consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will neither reweigh the evidence nor assess witness credibility.

*Barkwill v. Cornelia H. Barkwill Revocable Trust*, 902 N.E.2d 836, 839 (Ind. Ct. App. 2009) (internal citations and quotation marks omitted), *trans. denied*. "[W]hile we defer substantially to findings of fact, we do not do so to conclusions of law." *McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010) (internal citation omitted), *trans. denied*. "We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions." *Id.*

A. Fortuity

Dana argues that the trial court erred by concluding that the doctrine of fortuity did not apply to its claim. Specifically, Dana claims that BRC, rather than an unexpected, unintended action or event, caused IDEM to issue its NOV, which triggered the settlement agreement's indemnity clause. We agree with the trial court; fortuity is not applicable in this case.

In relying on the doctrine of fortuity, Dana attempts to use the terms "insurance" and "indemnity" interchangeably. Indiana courts have generally defined "insurance" as a contract of indemnity. *City of Gary v. Allstate Ins. Co.*, 612 N.E.2d 115 (Ind. 1993);

12

*Motorists Mut. Ins. Co. v. Morris*, 654 N.E.2d 861 (Ind. Ct. App. 1995). Indiana Code § 27-1-2-3(a) defines "insurance" as:

> a contract of insurance or an agreement by which one party, for consideration, promises to pay money or its equivalent to do an act valuable to the insured upon the destruction, loss or injury of something in which the other party has a pecuniary interest, or in consideration of a price paid, adequate to the risk, becomes security to the other against loss by certain specified risks; to grant indemnity or security against loss for a consideration.

"Implicit in the concept of insurance is that the loss occur as a result of an event that is fortuitous, rather than planned, intended, or anticipated." *General Housewares Corp. v. National Surety Corp.*, 741 N.E.2d 408, 414-15 (Ind. Ct. App. 2000) (quoting 7 LEE R. RUSS AND THOMAS F. SEGALLA, COUCH ON INSURANCE, § 102:7 at 17 (3d ed. 1997)). However, under the facts of this case, "indemnity" is appropriately defined as follows:

> Indemnity in its most basic sense means reimbursement and may lie when one party discharges a liability which another rightfully should have assumed, and it is based on the principle that everyone is responsible for his or her own wrongdoing, and if another person has been compelled to pay a judgment which ought to have been paid by the wrongdoer, then the loss should be shifted to the party whose negligence or tortious act caused the loss.

41 Am.Jur.2d *Indemnity* § 1 (2013).

Though insurance is generally defined as a contract of indemnity, the facts of this case show that every contract which contains an indemnity clause is not a contract of insurance. BRC did not seek to "insure" its business activities through Dana. Instead, Dana failed to notify BRC that the Plant was under EPA supervision. Once the EPA cited BRC for violations which it was not responsible for, BRC sued Dana. Simply stated, the settlement agreement was born out of BRC's desire to seek reimbursement or

13

to properly assign the cleanup costs to Dana for its use of PCBs and its subsequent omissions in complying with RCRA. BRC did not offer valuable consideration to Dana in exchange for payment for a future loss. Indemnity in this context is more geared toward the appropriate parties taking responsibility for the costs associated with conduct that has already occurred. Accordingly, the trial court properly concluded that the principle of fortuity did not apply.

B. Breach of Contract & Damages

Dana argues that the trial court erred by not awarding it the full amount of damages it sought. Specifically, Dana claims that because BRC disclosed the existence of the settlement agreement, presented a deceptive claim for indemnity, and refused to honor its "hold harmless" obligations under the settlement agreement, the trial court should have awarded the requested amount. In turn, BRC argues that Dana presented no evidence that any of its actions caused damage to Dana.

The measure of damages in a breach of contract case is the loss actually suffered by the breach. *Sammons Communications of Indiana, Inc. v. Larco Cable Const.*, 691 N.E.2d 496, 498 (Ind. Ct. App. 1998), *trans. denied*. To recover under a breach of contract claim, Dana must show that its damages flowed directly and naturally from the breach. *Id.* Although no particular degree of certainty is required in awarding damages, the award must be within the scope of the evidence. *Id.* Damages may not be awarded on guess or speculation, but must be ascertainable with reasonable certainty. *Ind. & Mich. Elec. V. Terre Haute Indus.*, 507 N.E.2d 588, 601 (Ind. Ct. App. 1987), *trans. denied*.

14

Regarding the breach of the confidentiality clause of the settlement agreement, Dana presented evidence of a possible breach but failed to show how any of the money spent on the remediation at the plant was a direct result of disclosing the existence of the settlement agreement. Mike Sickles from IDEM testified that the NOV was issued in response to the level of PCB contamination at the site and BRC's withdrawal from the VRP. Thus, it appears from the record that knowledge of the settlement agreement played no role in IDEM issuing the NOV.

As to the rest of its claims, Dana relies on the case of *Fowler v. Campbell*, 612 N.E.2d 596 (Ind. Ct. App. 1993) to support its claim of full damages sought because BRC's actions were a substantial cause of the breach of the settlement agreement.

In *Fowler*, the Campbells hired Fowler to build a custom house, including a septic system. Before entering into a contract with Fowler, the Campbells consulted with their homeowner's association and the local department of health to ensure the septic system complied with association and department standards. Once both entities approved the plans, a contract was executed providing that Fowler would build the house, including the septic system, according to the approved plans. After the Campbells moved in, their septic system failed three times, with sewage backing up in their home. Each time Fowler performed repairs, he found debris in the septic system. Fowler told the Campbells that this debris prevented the septic system from functioning properly. During the third repair, Fowler installed a new septic tank and warning light on the system. It was then that the Campbells discovered that the septic system was not installed according to their contract. Fowler fixed the septic system and sewage no longer backed up in the

15

Campbell's home, though sewage water continued to leak into the Campbell's driveway, yard, and lake behind their house. The Campbells sued Fowler for breach of contract. After a bench trial, the trial court entered judgment for the Campbells.

On appeal, Fowler claimed that the Campbell's misuse of the septic system, and not his failure to install it according to plan, caused the damages. In affirming the trial court's judgment, we stated that where there are multiple causes of injury arising from a breach of contract, Indiana follows the common law test of causation in contract actions; that is, we decide if a breach was a substantial factor in bringing about the harm, not whether other causes may have contributed. *Fowler*, 612 N.E.2d at 602.

Here, while BRC's entry into the VRP may have contributed to bringing any remaining contamination at the Plant to IDEM's attention, the evidence shows that it was the high levels of PCB and Dana's failure to fully comply with RCRA that were the substantial causes of IDEM issuing the NOV and the subsequent remediation costs. Accordingly, Dana's reliance on *Fowler* is misplaced.

C. The Settlement Agreement

Dana claims that the trial court erred in its allocation of damages by not properly interpreting the settlement agreement. Specifically, Dana claims that the trial court incorrectly interpreted the word "solely" in concluding that Dana's indemnity obligations had been triggered. In its cross appeal, BRC argues that it is not liable for any of the costs because the settlement agreement, which the trial court has concluded is the sole basis for recovery, provides no basis for the allocation of costs based on whether either BRC or Dana used an area of the plant.

16

> We observe first that our courts strongly favor settlement agreements in resolving disputes and controversies. This is because settlements allow our courts to operate more efficiently and equally important, allow the parties to fashion the outcome of their disputes through mutual agreement.
>
> Interpreting and construing contract provisions is a task often undertaken by our courts. When reviewing a trial court's ruling in that regard, our task is essentially the same as that employed by the trial court. We assign words and phrases employed in a contract their plain and ordinary meaning, unless we conclude the terms are ambiguous. Where the terms of a contract are clear and unambiguous, the terms are conclusive and we will not construe the contract or look at extrinsic evidence but will merely apply the contractual provisions. The terms of a contract are not ambiguous merely because controversy exists between the parties concerning the proper interpretation.

*Travelers Indem. Co. v. P.R. Mallory & Co.*, 772 N.E.2d 479, 485 (Ind. Ct. App. 2002) (internal citations and quotations omitted).

Here, the trial court determined in its conclusions of law that the settlement agreement was the only basis for recovery. Yet, the trial court concluded that splitting the allocation of costs between the parties was reasonable because Dana and BRC used certain areas of the plant during the time period in question. This conclusion would be appropriate if the settlement agreement was ambiguous as to which party was responsible for costs in the event a claim was brought. However, the terms of the settlement agreement, particularly the indemnity and hold harmless clauses, are clear and unambiguous as to these issues. Per our standard of review, we must simply apply the contract to the facts at hand.

The scope of Dana's indemnity to BRC if a claim arises is clearly stated: "Such indemnity shall include, without limitation, indemnity from penalties, closure, corrective action, disposal and clean-up activities, and shall continue in full force and effect until

17

June 1, 2007." (Ex. Index, Vol. III, Ex. 5). The only thing limiting Dana's indemnification was the hold harmless clause in paragraph 4 of the settlement agreement. BRC was to hold Dana harmless:

> for violations, fines, pollution, remediation work, contamination, natural resource damage, personal injury or property damage arising out of acts, conduct or omissions at the Plant since May 21, 1985, unless such claims arise out of Dana's alleged treatment, storage or disposal of hazardous waste or hazardous substances activities at the Plant.

(Ex. Index, Vol. III, Ex. 5). Of all the areas investigated and remediated, SWMU 4, the trash burning area, was the only area of the plant used solely by BRC; Dana never used this area during the time it operated the plant. Confining recovery of damages to the settlement agreement, and effecting the intent of the parties as stated therein, BRC should hold Dana harmless for these costs. We find that the trial court erred by not confining its allocation of costs to the four corners of the settlement agreement. Accordingly, we affirm the trial court's award of damages to Dana, but reverse the amount awarded.[6] Dana is entitled to damages of $3,608.87 in investigative costs and administrative costs of $1,818.01, for a total damage award of $5,426.88.


D. Prejudgment Interest

---

[6] In the alternative, Dana claimed that it was entitled to reimbursement for the costs of removing underground storage tanks as a matter of law. Dana relies on sections of the Indiana Fire Code and Petroleum Facility Statute in making this claim. However, as we found with Dana's claim of lack of fortuity, and as the trial court stated in its conclusions of law, the settlement agreement is binding and is the sole basis for recovery in this case.

18

Dana claims that the trial court erred in not awarding prejudgment interest to damages. BRC contends that the damages were not easily ascertainable, thus preventing the award of prejudgment interest.

We review a decision regarding the award of prejudgment interest for an abuse of discretion. *Bopp v. Brames*, 713 N.E.2d 866 (Ind. Ct. App. 1999), *trans. denied*. "An award of prejudgment interest rests on a factual determination and this Court may only consider the evidence most favorable to the appellee." *Board of Sch. Trustees of Baugo Community Schools v. Indiana Ed. Employment Relations Bd.*, 412 N.E.2d 807, 812 (Ind. Ct. App. 1980).

Prejudgment interest is appropriate in a breach of contract action when "the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable." *Kummerer v. Marshall*, 971 N.E.2d 198, 201 (Ind. Ct. App. 2012) (quoting *Olcott Int'l & Co. v. Mirco Data Base Sys., Inc.*, 793 N.E.2d 1063, 1078 (Ind. Ct. App. 2003), *trans. denied*), *trans. denied*. The award of prejudgment interest is considered proper when the trier of fact does not have to exercise judgment in order to assess the amount of damages. *Town of New Ross v. Ferretti*, 815 N.E.2d 162, 170 (Ind. Ct .App. 2004) (citing *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1140 (Ind. Ct. App. 2002)). Examples of such cases where prejudgment interest is appropriate include those for breach of contract when the damages were principal payments made under a promissory note, *Tracy v. Morell*, 948 N.E.2d 855, 867 (Ind. Ct. App. 2011), the amount of a mechanics' lien for a contractor's unpaid bills for a remodeling project, *Hayes v. Chapman*, 894 N.E.2d 1047, 1054–55 (Ind.Ct.App.2008), *trans. denied*, and an amount

19

stipulated to at a damages hearing, *Noble Roman's, Inc.*, 760 N.E.2d at 1140. In all of these cases, the amount of damages was clear and did not require any interpretation or judgment on the part of the trier of fact.

Here, where the trial court's allocation of liability was split between the parties based upon whether RMT's method was reasonable, prejudgment interest would normally not be appropriate. However, allocating costs according to the terms of the settlement agreement, BRC was to hold Dana harmless for conduct at the plant after May 12, 1985. Thus, BRC would be responsible for the cost of investigating and remediating the trash burning area. This amount was readily ascertainable at $5,426.88. "Once it appears that damages can be ascertained with reasonable precision, an award of prejudgment interest is mandatory." *Hayes v. Chapman*, 894 N.E.2d 1047, 1054-55. (Ind. Ct. App. 2008), *trans. denied*. Per Ind. Code § 24-4.6-1-103, an interest rate of eight percent (8%) per year for forty-eight (48) months is allowed on the damages for a prejudgment interest award of $1,956.32.

Accordingly, we affirm the trial court's judgment in favor of Dana, but reverse and remand with instructions to award damages and prejudgment interest consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

KIRSCH, J., and VAIDIK, J., concur.