

FILED
Aug 20 2024, 9:18 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N T H E

# Court of Appeals of Indiana

Quinisha L. Williams

*Appellant*

v.

Willie Cardona-Feliciano,

*Appellee*

---

August 20, 2024

Court of Appeals Case No.
24A-DC-750

Appeal from the Kosciusko Superior Court

The Honorable Christopher D. Kehler, Judge

Trial Court Cause No.
43D04-2109-DC-282

---

**Opinion by Judge Bailey**
Chief Judge Altice and Judge Mathias concur.

**Bailey, Judge.**

# Case Summary

Quinisha Williams ("Mother") appeals the denial of her request to relocate her three children ("Children") from her marriage to Willie Cardona-Feliciano ("Father")[1] to Alabama. Mother presents the sole issue of whether the trial court clearly erred by finding that relocation was not in Children's best interests and that, should Mother relocate, Father would immediately assume their sole legal and primary physical custody – notwithstanding the uncontroverted evidence that he had twice been convicted of committing felonies against Mother and had not completed a court-ordered domestic batterer's program. We reverse and remand with instructions to the trial court to grant Mother's request for relocation and set for hearing the matter of Father's long-distance parenting time, at which evidence should be presented as to Father's compliance with any prior court order arising from his domestic battery convictions.

# Facts and Procedural History

On October 13, 2021, Mother petitioned for dissolution of her marriage to Father. At a provisional hearing conducted in March of 2022, Mother was

---

[1] Mother had two prior-born children. Father had four prior-born children in Puerto Rico and one in Alabama.

awarded the sole legal and primary physical custody of Children; Father did not appear at that hearing. Father was awarded parenting time consisting of eleven hours each Saturday and ordered to pay child support. On May 30, 2023, Mother filed a Notice of Relocation, requesting that Children be relocated with her to Alabama; Mother averred that both she and Father had extended family there. Mother further averred that Father had not been exercising his parenting time. On June 6, Father filed his objection to Mother's Notice of Relocation. Mother filed requests that two witnesses appear remotely; the trial court summarily denied the requests.

[3] On September 26, the parties appeared for a final hearing, with Mother represented by counsel and Father appearing pro-se. Mother presented evidence that Father had pled guilty in 2020 to Domestic Battery, enhanced to a Level 6 felony because it was committed in the presence of a minor child. He had struck Mother in the head with a glass vodka bottle and Mother required hospitalization and staples in her head. Father had received a sentence of one year in a county jail. Mother also presented evidence that, in 2022, Father had agreed to plead guilty to Intimidation, as a Level 6 felony, upon dismissal of a higher-level felony charge. This stemmed from an incident in which Mother attempted to leave Father and he threatened Mother with a knife, again in the presence of a minor child. Father received a sentence of eighteen months in jail, with all but 120 days suspended. Following his conviction for Intimidation, Father was subject to a No Contact order prohibiting his contact with Mother, effective until February 28, 2024.

[4] Mother testified that the eldest of Children had been born in Alabama in 2018, where Mother ran a printing business after her discharge from the Marine Corp. Mother had several relatives there, including her two older children, and Father had an older son there. In May of 2018, Mother and Father were married in Alabama. Soon thereafter, Father traveled to Indiana for work. According to Mother, she came to Indiana for a "visit" in 2018 but was "trapped" by Father. (Tr. Vol. II, pg. 56.) Mother testified that Father took her vehicle, driver's license, debit card, and cell phone, leaving Mother and the infant to stay in a hotel. The couple located permanent housing and had two more children, born in 2019 and 2021. Mother did not return to live in Alabama.

[5] Mother testified that, although Father had only two felony convictions, his abuse of her had been pervasive throughout their relationship. Mother's counsel asked that Mother explain the history of domestic violence, whereupon the trial court advised that Mother had already been given provisional custody of Children. Father responded: "Yeah, I no got [sic] an issue with that. She can have the kids." (*Id.* at 64.) The court then admonished "we don't need testimony on those issues." (*Id.* at 65.) However, because Mother objected to Father having overnight visits, her counsel continued to elicit testimony relative to Father's treatment of Mother, Children, and Mother's older children.

[6] Mother testified that Children had witnessed abuse on an almost daily basis; they were afraid of Father, but also had "mixed emotions" and would "love Dad naturally." (*Id.* at 73.) According to Mother, the youngest child had nightmares and was in therapy because of the incidents she had witnessed.

Mother testified that Father beat her severely during the second pregnancy but did not beat her during the third pregnancy; she attributed this to his pending battery charge. However, according to Mother, Father refused to bring home sufficient food and allocated snacks to only his children, so that Mother would forgo eating to give portions to her older children. Also, she testified that Father would threaten to return to his native Puerto Rico or "put her in the hospital" if she did not comply with his wishes. (*Id.*)

[7] Michelle Campbell, MSW, testified that she was providing therapy to the eldest of the couple's children and also to Mother's two prior-born children, because of their exposure to domestic violence. Campbell had diagnosed five-year-old A.C. with post-traumatic stress disorder ("PTSD"); she experienced recurring fear that Mother would die after witnessing Father hold a knife to Mother. Campbell also testified that the older children had reported "multiple instances of domestic violence," and Campbell opined that, based "on the older girls' reports," she believed that Father could pose a physical threat to Children. (*Id.* at 91, 96.) Campbell also testified that she had reviewed reports from the Department of Child Services ("DCS"), substantiating Father's neglect of Children.

[8] Demetria Futch, the maternal grandmother of Children ("Grandmother"), testified that she was willing to provide a place for Mother and Children to stay in Alabama. She testified that she had observed "plenty of injuries" on Mother and also that Father had once put Mother's "head through a wall." (*Id.* at 106.)

She described Father as having "anger patterns" and claimed that he had been responsible for holes in the wall and a broken door frame. (*Id.* at 107.)

[9] After Mother rested her case, Father was afforded the opportunity to present his case. He did not call witnesses, but addressed the court in pertinent part as follows:

> Thank you. I'm not a perfect – perfect guy, I know I'm not the better human [in] this world, but I have everyday I'm trying to do the best that I was yesterday and I made a mistake with her, yeah, I pay for. I've been in jail, I'm [sic] accept it, but I believe if somebody punched you a couple times, you can defend yourself for somebody to – to you being hit. You know? Sometimes you get tired of that. But at this point, the only – I want to – I just really want, is just have that – my divorce done and spend some time with my kids. And the other thing I'm worried about it she move to Alabama is because her momma, she smoke weed, she have too many mens [sic] when she was telling me. I telling you this thing because of her. And her mother is on – she's on weed, smoking, she got her license or whatever, she can do it and she go out with different step-daddy so I was telling her, I say, "Why you want to move to Alabama?" In Alabama, who knows Alabama, Alabama is nothing. This is the part, like, to me because I want to move to here. I love Indiana and in Alabama it's just bad pay, drugs and bad people down there where they live. I was living there at one -- the one of the stuff bring me here not only because I got [an] opportunity to work.
>
> My only concern [is] just to see my kids and spend quality time with my daughters.

(*Id.* at 111.)

On cross-examination, Father clarified that he was not denying that he "beat up" Mother; the court interjected that Mother's counsel "already introduced the exhibits." (*Id.* at 118.) Father additionally admitted that he had not completed a domestic batterer's program, as ordered by the Elkhart Circuit Court. At the conclusion of Father's testimony, Mother's counsel inquired whether Father had an objection to the relocation. Father responded: "No, let her go. If she wants to go to the moon, let her go to the moon. The more far away she be from me, I'm – I'm good. I just want to see my kids." (*Id.* at 124.)

This line of questioning was followed by clarification from the trial court: "She is wanting to move to Alabama and take the three children," to which Father responded: "Let her go. Okay. Let her go because I really don't have more time to keep losing jobs." (*Id.* at 124.) Father reiterated "let her do whatever she want[s]," but asserted "I just want to be a father with my kids." (*Id.* at 125.) When asked by the trial court how he would exercise parenting time, Father responded, "it isn't possible because the driving is too far away" and explained that he had moved from Alabama because it "is nothing, zero. No pay, no money, drugs everywhere. It's not good at all." (*Id.*) The trial court pressed Father: "So you're not going to see your kids?" and Father assured the trial court that he was "not putting myself at any risk for anybody." (*Id.* at 126.) Finally, the trial court addressed Father: "So you want me to enter an order saying Mom and the children can go to Alabama" and Father responded: "Yeah." (*Id.*) The trial court pronounced the marriage dissolved and signed an order to that effect but took the matter of relocation under advisement.

[12] After the hearing, the trial court apparently became concerned that Father's understanding of the proceedings or his position on relocation was in question. On October 3, the trial court made a docket entry reflecting that the court was sending Father a form upon which Father was to indicate whether or not he agreed that the Children should relocate to Alabama with Mother. On October 9, Father filed with the court a form with his signature and a check mark beside the pre-printed words: "I, Willie Cardona-Feliciano, do not agree that it is in the best interest of my minor children to relocate to Alabama with their Mother." (App. Vol. II, pg. 114.)

[13] On December 28, 2023, the trial court entered its findings of fact, conclusions thereon, and order denying Mother's request for relocation. As the parties had agreed, Mother was awarded sole legal and primary physical custody of Children. However, Father was to be awarded "immediate" sole legal custody and primary physical custody of Children should Mother relocate to Alabama. (Appealed Order at 11.) Mother's motion to correct error was deemed denied and this appeal ensued.

## Discussion and Decision

[14] As a preliminary matter, we observe that Father has not filed an appellee's brief. "Under that circumstance, we do not undertake to develop an argument on the appellee's behalf, but rather may reverse upon an appellant's prima facie showing of reversible error." *Morton v. Ivacic*, 898 N.E.2d 1196, 1199 (Ind.

2008). "Prima facie error in this context is defined as, 'at first sight, on first appearance, or on the face it.'" *Id.* (citation omitted).

[15] Where, as here, the trial court enters findings of fact and conclusions thereon without an Indiana Trial Rule 52 written request from a party, the entry of findings and conclusions is considered to be sua sponte. *Dana Companies, LLC v. Chaffee Rentals*, 1 N.E.3d 738, 747 (Ind. Ct. App. 2013), *trans. denied*. Where the trial court enters specific findings sua sponte, the findings control our review and the judgment only as to the issues those specific findings cover. *Id.* Where there are no specific findings, a general judgment standard applies, and we may affirm on any legal theory supported by the evidence adduced at trial. *Id.*

[16] A two-tier standard of review is applied to the sua sponte findings and conclusions made: whether the evidence supports the findings, and whether the findings support the judgment. *Id.* Findings and conclusions will be set aside only if they are clearly erroneous, that is, when the record contains no facts or inferences supporting them. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* In conducting our review, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id.* We will neither reweigh the evidence nor assess witness credibility. *Id.*

[17] Indiana Code Section 31-17-2.2-2 provides:

> (a) If a party provides notice of relocation at an initial hearing to determine custody, the court may consider the factors set forth in this chapter in the court's initial custody determination.

(b) The court may consider a proposed relocation of a child as a factor in determining whether to modify a custody order, parenting time order, grandparent visitation order, or child support order.

Mother made her request for relocation of Children after she had been awarded their sole legal and primary physical custody on a temporary basis and before entry of the final decree of dissolution and award of custody. Indiana Code Section 31-17-2.2-1(c) provides:

The court shall take into account the following in determining whether to modify a custody order, parenting time order, grandparent visitation order, or child support order:

(1) The distance involved in the proposed change of residence.

(2) The hardship and expense involved for the nonrelocating individual to exercise parenting time or grandparent visitation.

(3) The feasibility of preserving the relationship between the nonrelocating individual and the child through suitable parenting time and grandparent visitation arrangements, including consideration of the financial circumstances of the parties.

(4) Whether there is an established pattern of conduct by the relocating individual, including actions by the relocating individual to either promote or thwart a nonrelocating individual's contact with the child.

(5) The reasons provided by the:

(A) relocating individual for seeking relocation; and

(B) nonrelocating parent for opposing the relocation of the child.

(6) Other factors affecting the best interest of the child.

The order herein indicates that the trial court considered a determination of the "best interest of the children" to "include, by implication, the factors set forth for custody determinations and modifications under Ind. Code § 31-17-2-8." Appealed Order at 8. These factors are:

1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

(9) A designation in a power of attorney of:

(A) the child's parent; or

(B) a person found to be a de facto custodian of the child.

Ind. Code § 31-17-2-8. Here, the parties agreed that Mother would be the primary custodian of Children, implicitly agreeing that the circumstances relative to the statutory factors supported that result.

[19] Where the nonrelocating parent objects to a relocation request, "[t]he relocating individual has the burden of proving that the proposed relocation is made in good faith and for a legitimate reason." Ind. Code § 31-17-2.2-5(c). "If the relocating individual meets the burden of proof under subsection (c), the burden shifts to the nonrelocating parent to show that the proposed relocation is not in the best interest of the child." Ind. Code § 31-17-2.2-5(d).

[20] There are no explicit criteria for determining whether a relocation request is made in good faith and for a legitimate reason. *Gold v. Weather*, 14 N.E.3d 836, 842 (Ind. Ct. App. 2014). This Court has generally required the relocating parent to demonstrate an objective basis that is "more than a mere pretext" for relocating. *B.L. v. J.S.*, 59 N.E.3d 253, 259 (Ind. Ct. App. 2016) (quoting *T.L. v. J.L.*, 950 N.E.2d 779, 784 (Ind. Ct. App. 2011) ), *trans. denied*.

> It is commonly understood in today's society that individuals move in order to live closer to family members, for financial reasons, and for employment opportunities. As such, "[w]e infer that these and similar reasons ... are what the legislature intended in requiring that relocation be for 'legitimate' and 'good faith' reasons."

*Id.* (citation omitted). "[T]he resolution of a relocation request ultimately turns on a judicial determination regarding the best interests of the children involved." *H.H. v. A.A.*, 3 N.E.3d 30, 36 (Ind. Ct. App. 2014), *trans. denied*.

[21] In the order under review, the trial court employed language indicating that it considered much of the testimony from Mother, Grandmother, and Campbell to be lacking in credibility. That is, the trial court was persuaded that the therapist was influenced by Mother, that Grandmother did not have the opportunity for interactions with Children that she described, and that Mother could not be entirely believed. In part, the order states: "The Court was unimpressed with Mother's testimony, *much* of which lacked credibility." Appealed Order at 6 (emphasis added). We are mindful of our role; we do not act as a fact-finder and cannot assess credibility. *Dana Companies, LLC*, 1

N.E.3d at 747. However, the trial court did not specifically delineate what portions of Mother's testimony were to be disregarded as incredible. And Father's testimony challenged only one of Mother's and Grandmother's assertions; that is, Father did not agree that Gordon, Alabama is a promising location. Father did not in any respect challenge the accusations of his harmful conduct. He freely admitted that he had criminal convictions and a protective order stemming from his conduct against Mother; he admitted his non-compliance with court orders pertaining to his status as a domestic abuser; and he did not explain or contest the claims of additional uncharged criminal conduct. Indeed, he apologized in open court for his past conduct and repeatedly asserted that he was not perfect. With this background, we turn to Mother's argument.

[22] Mother contends that the "trial court made multiple findings that were unsupported by the record and the findings that were supported by the evidence were insufficient to deny Mother's request to relocate to Alabama." Appellant's Brief at 18-19. We address the challenged findings in turn.

[23] Finding 1 provides in part: "Mother left Alabama and moved to Indiana to reside with Father. Mother never left Indiana after June of 2018." Appealed Order at 2. Mother argues that the finding is clearly erroneous because the uncontroverted testimony was that she traveled to Indiana only for a visit and was then trapped. Mother and Grandmother testified that Mother intended to return to Alabama and left behind an ongoing business and furnished apartment that Grandmother eventually had to close and empty. However, a fact-finder is

not obliged to credit testimony even when it is uncontroverted. *See Hicks v. State*, 5 N.E.3d 424, 428 (Ind. Ct. App. 2014) (recognizing that, when a trial court is acting as the trier of fact, it has the right to judge the credibility of witnesses), *trans. denied*. We cannot say that this finding is erroneous.

[24] Mother also challenges Finding of Fact 13, in which the trial court observed that Father expressed a "desire to exercise parenting time" at the September 26, 2023, hearing, in contrast to an earlier hearing at which there was "no evidence or insufficient evidence of parenting time … presented." Appealed Order at 4-5. Mother observes that Father did not appear at the earlier hearing to present evidence. True, but Mother does not identify error in the text of the finding.

[25] Finding of Fact 16 provides: "Mother's testimony included statements that she would never take the children from their Father, that the children enjoy their Father and seem to love it when he is present." Appealed Order at 5. This is a mere recitation of something purportedly said. As we have explained,

> "Findings of fact are a mechanism by which a trial court completes its function of weighing the evidence and judging witnesses' credibility." *Garriott v. Peters*, 878 N.E.2d 431, 438 (Ind. Ct. App. 2007), *trans. denied*. A satisfactory finding of fact "is a simple, straightforward statement of what happened." *Perez v. U.S. Steel Corp.*, 426 N.E.2d 29, 33 (Ind. 1981).

> "A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier of fact must find that what the witness testified to is the fact." *In re Adoption of T.J.F.*, 798 N.E.2d 867, 874 (Ind. Ct. App. 2003) (citation omitted). As such, where a trial court's

findings are merely recitations of a witness' testimony, they cannot be construed as "true factual determinations." *Garriott*, 878 N.E.2d at 438. We treat the trial court's inclusion of these findings as "mere surplusage" rather than harmful error. *Perez*, 426 N.E.2d at 33. However, where the trial court has adopted the witness' testimony, such a "'finding' may be considered a finding of fact." *In re Adoption of T.J.F.*, 798 N.E.2d at 874.

*Pitcavage v. Pitcavage*, 11 N.E.3d 547, 553 (Ind. Ct. App. 2014). But Finding of Fact 16 suffers from an independent infirmity – it is not an accurate reflection of Mother's testimony. Mother testified that Children were afraid of Father, having witnessed near-daily instances of his physical, psychological, and sexual abuse toward her. She nonetheless acknowledged that Children had mixed emotions, which included love for Father.

[26] Finding of Fact 17 provides: "Mother further testified that Father would pick them up from school and they would on occasion go out for pizza and he would buy them things." Appealed Order at 5. Again, this is a mere recitation of testimony rather than a true finding of fact. It appears to reference Mother's description of the "few" visits Father had with Children; that is, she testified that Father picked them up from school, bought pizza and candy, and would "watch them eat pizza" before being "on his way." (Tr. Vol. II, pg. 79.)

[27] Finding of Fact 18 provides: "Mother also testified that Father would take them to the park on Saturdays and/or Sundays and the children enjoy time with their Father." Appealed Order at 5. Again, this is a mere recitation of alleged testimony rather than a true finding of fact. And it could not constitute

a true and accurate finding of fact because Mother did not testify accordingly. Rather, Father made an isolated reference to going to a park in the course of his cross-examination of Campbell, and he later advised the trial court: "I want to take [Children] to the park." (Tr. Vol. II, pg. 126.)

[28]    Finding of Fact 19 provides:

> Michelle Campbell testified that she provides therapy services for [A.C.]. She has not met with Father or ever spoken to him. All of the information she knows about Father was self-reported by Mother and [A.C.]. The Court suspects that some of the information the therapist received from [A.C.] about her father was based upon information [A.C.] received from Mother. Father believes Mother's actions and behavior contribute to [A.C.]'s need for therapy. The therapist indicated that she had not reached out to Father or ever met Father. The therapist has never seen the children in Father's presence. The Court believes that family therapy involving Father and the children would be beneficial to the children.

Appealed Order at 5-6. To the extent that the trial court concluded that all of Campbell's information came from Mother and A.C., this does not accurately reflect Campbell's testimony. Campbell testified that the oldest children, who are not Father's children, reported witnessing multiple instances of domestic abuse. She specified that her fear that Father would engage in physical abuse of one or more of the children if allowed unsupervised parenting time was based upon the older children's reports. Campbell also stated that she had reviewed DCS reports. Finally, if Father subjectively believed that Mother's actions and

behavior contributed to A.C.'s need for therapy, he did not testify to such. In these respects, the finding is erroneous.

[29] Finding of Fact 20 states in part that the court found Grandmother's testimony "lacking credibility considering that the two youngest children were born in Indiana and have never been to Alabama. It would have been unlikely, if not impossible, for Grandmother to have observed Father with the two youngest children." Appealed Order at 6. As previously stated, it was the role of the trial court as the fact-finder to determine credibility. However, Mother has two older children who lived in Alabama and interacted with Father, and Grandmother, at least in part, testified as to those interactions. The trial court did not address Grandmother's claim that she had witnessed numerous physical injuries on Mother and thus, as best we can discern, did not discard that testimony for lack of credibility.

[30] Finding of Fact 21 states: "The Court was unimpressed with Mother's testimony, much of which lacked credibility." *Id.* It is a matter of criminal record that Mother was the victim of two felonies at the hands of Father. These felonies were committed in the presence of one or more of the minor children in the household. A protective order was issued for Mother's protection. Father was ordered to complete services for domestic battery offenders. He did not do so. It is, to put it mildly, perplexing that the trial court was "unimpressed" with Mother's testimony. The finding is not helpful to our review, as it does not specify which part of Mother's testimony was credited and which was disbelieved by the trial court.

[31]     Findings of Fact 21 and 22 pertain to Mother's "focus[] on her dislike of Father" and her "little, if any, efforts to encourage the children to spend additional time with their Father." *Id.* These findings are not demonstrably false. However, it may well have been inadvisable for Mother to encourage additional parenting time in the context of Father's refusal to complete court-ordered services, the existing (and uncontested) order that he have parenting time without overnights, and the protective order.

[32]     Finding of Fact 25 recites in part that Father "expressed concerns about the poverty, lack of employment opportunities, crime and drugs in the area where Mother wants to relocate" and further recites that "Mother provided no testimony to rebut Father's concerns." Appealed Order at 7. Again, a recitation that Father testified to something is not a true finding of fact.

[33]     Finally, Finding of Fact 26 states in part that Mother had authored a victim impact statement in a criminal case, wherein she purportedly claimed that Father helped with caring for Children so that she could work and expressed a desire that Father have a chance to raise his daughters. No victim impact statement was admitted into evidence; nor did either party request that the trial court take judicial notice of a victim impact statement. The trial court did not provide the parties with an opportunity to contest the taking of judicial notice. This finding is superfluous to our review.

[34] In sum, the true findings of fact which have evidentiary support and are pertinent to relocation[2] are as follows. Mother has resided in Indiana for several years; the youngest two children have always lived in Indiana. Father has a relationship with Children and has picked them up from school and provided pizza to them. Father is employed in Indiana. The sua sponte findings do not directly address the circumstances of Father's criminal convictions or his subsequent non-compliance with court-ordered services; there is a recitation of two cause numbers and an oblique reference to "issues amongst themselves." Appealed Order at 7. The trial court appears to have wholly rejected the therapist's testimony based upon its concern of "self-reporting" from Mother and a child and upon the trial court's "susp[icion]." *Id.* at 5.

[35] On the matter of relocation, the trial court was tasked with concluding, as a matter of law, whether Mother had met her burden of showing that the request was made in good faith and for a legitimate purpose and, if so, whether Father had shown that the proposed relocation was not in the best interest of Children. I.C. § 31-17-2.2-5. The trial court did not reach a specific conclusion as to whether the request was made in good faith and for a legitimate purpose. The order states that Mother "arguably" presented a good faith and legitimate reason. Appealed Order at 10. The order also provides in part:

---

[2] There are several unchallenged factual findings related to personal property, child support, and historical facts of the parties' relationship.

> [T]he Court *questions* whether Mother's desire to relocate is made in good faith and for a legitimate purpose. Notwithstanding the same, *assuming* Mother's reasons were determined to be in good faith and for a legitimate purpose, Father has met his burden and shown that the proposed relocation is not in the children's best interest.

Appealed Order at 9. (emphasis added.) Thus, although the trial court did not reach a conclusion on the threshold question, it concluded that Father had shown that relocation is not in Children's best interest. The court expressed its reasoning as follows: "Father and his children would no longer be able to see one another, and if the children moved to Alabama, they will grow up effectively fatherless. It is in the best interest of the minor children to remain in Warsaw with involvement of both parents." (*Id.* at 10.)

[36] Here, looking through the lens of the *prima facie* standard applicable when claims on appeal are unchallenged, our review of the record leaves us with a firm conviction that a mistake has been made. Mother's stated reason for relocation was the need for extended family support; that is, Grandmother was willing to serve as an additional caregiver so that Mother could be employed. Mother testified that Father had historically been unwilling to help her with child care; Father did not claim otherwise. Indeed, Mother testified that Father would disappear from Children's lives for extended periods of time and also that he threatened to return to Puerto Rico. Although not making a threat as such, at the final hearing, Father stated to the trial court: "I've got my own house in Puerto Rico, I can go to Puerto Rico. I am not going there because I

feel this is my house." (Tr. Vol. II, pg. 126). With due regard to the trial court's finding that much of Mother's testimony lacked credibility, the central tenants of her testimony have much corroboration.

[37] Children have several family members, including a half-sibling, in Alabama. Father does not have relatives in Indiana but has a child in Alabama.[3] Although the trial court inexplicably chose not to focus upon the history of domestic violence in its order, it is without reasonable question that Mother is a domestic violence survivor and Father is the perpetrator. As of the commencement of the final dissolution hearing, Father had not progressed from day-time-only parenting time and he had not completed court-ordered therapy and classes. Father apologized for his past conduct and repeatedly asserted that he was not opposing the relocation. Although Father expressed a desire to see Children, he did not testify regarding hardship or expense to travel to Alabama – where he might also see his elder son – but rather flatly refused to "put [himself] at risk for anybody." (Tr. Vol. II, pg. 126.)

[38] Based upon some internal confusion documented *after* the hearing, the trial court sent a form to Father – after the close of the evidence – to ascertain Father's wishes on relocation. Of utmost concern is the trial court's provision

---

[3] By Father's account, he has thus far refused to have a relationship with that child because the child does not bear Father's last name. There may also be a protective order in place as to that child's mother. Father testified that he did not know if his former partner had a protective order preventing Father from contact with her. He acknowledged having been charged with criminal conduct against his former partner but explained that the charges were dismissed when a judge "figured out she was lying." (Tr. Vol. II, pg. 117.)

for summary transfer of custody to Father should Mother relocate, although Father has a history of domestic violence *in the presence of Children*, has not completed his court-ordered services, and the testifying therapist expressed fear that Father could physically harm Children and their elder siblings.[4] Mother has met her burden to show that the trial court erred, prima facie, in denying her request for relocation of Children.

## Conclusion

[39] The trial court's findings of fact are replete with misstatements of some testimony and mere recitations of others. Putting aside such purported findings, there is minimal reflection in the remaining findings relative to the evidence presented. The findings largely ignore or minimize the uncontroverted history of domestic violence, therapist recommendations, one child's diagnosis of PTSD, and Father's repeated in-court acquiescence to relocation. However, the trial court elected to issue a post-hearing form for completion by Father. Inexplicably, the trial court provided for summary transfer of Children's physical custody to Father, should Mother relocate, although they had been traumatized by Father's domestic violence against Mother and he had not completed services ordered by the criminal court with the objective of keeping Children safe. In light of the appalling lack of

---

[4] We acknowledge that the eldest siblings are not the focus of the request for relocation. Nonetheless, it is reasonable to anticipate that a trial court would consider the consequences of an order as to those additional minors.

sensitivity toward domestic violence victims, including Children, the ex parte communication, and the deficiencies of the order, we conclude that it is, *prima facie*, clearly erroneous.

[40] Reversed and remanded with instructions to grant Mother's petition for relocation and conduct a parenting time hearing.

Altice, C.J., and Mathias, J., concur.

ATTORNEY FOR APPELLANT

Audrey Lundsford
Law Office of Mark Nicholson
Indianapolis, Indiana