

FILED

Sep 28 2018, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jay P. Lefkowitz
Kirkland & Ellis, LLP
New York, New York

Paul D. Clement
Kirkland & Ellis, LLP
Washington, D.C.

Andrew W. Hull
Laurie E. Martin
Hoover Hull Turner, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Peter J. Rusthoven
John R. Maley
J. Curtis Greene
Meredith Thornburgh White
Barnes & Thornburg, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

International Business Machines
Corporation,

*Appellant/Cross Appellee-
Defendant/Plaintiff,*

v.

State of Indiana, acting on behalf
of the Indiana Family & Social
Services Administration,

*Appellee/Cross Appellant-
Plaintiff/Defendant.*

September 28, 2018

Court of Appeals Case No.
49A02-1709-PL-2006

Appeal from the Marion Superior
Court

The Honorable Heather A. Welch,
Judge

Trial Court Cause No.
49D01-1005-PL-21451

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant/Cross-Appellee-Defendant/Plaintiff, International Business Machines Corporation (IBM), appeals the trial court's calculation of damages after materially breaching the Master Services Agreement which IBM had entered into with Appellee/Cross-Appellant- Plaintiff/Defendant, the State of Indiana, Acting on Behalf of the Indiana Family & Social Services Administration (State).[1]

We affirm in part, reverse in part, and remand with instructions.

# ISSUES

IBM raises three issues on appeal, which we restate as:

(1) Whether the trial court, on remand for calculation of damages, erred in concluding that the findings of fact issued by the previous trial court, presided over by Judge Dreyer after a six-week bench trial, are not part of the law of the case and therefore not binding on the trial court;

(2) Whether the trial court erred in awarding damages to the State that arose from the implementation of the Hybrid system, which was purported to be different from the system contracted for under the Master Services Agreement; and

---

[1] We held oral argument on August 21, 2018, in the Supreme Court courtroom at Indianapolis, Indiana. We thank counsel for their eloquent oral advocacy and civil professionalism during the argument.

(3) Whether IBM is entitled to post-judgment interest on its $49.5 million damages award.

[4] The State raises two issues on Cross-Appeal, which we restate as:

(1) Whether the trial court correctly applied the direct damages cap specified in the Master Services Agreement; and

(2) Whether the trial court properly rejected the State's request to include the salaries for new state employees as part of its direct damages.

## FACTS AND PROCEDURAL HISTORY

[5] The latest installment in the seemingly never-ending saga between the State and IBM comes before us as an appeal from the trial court's Order upon remand from the supreme court to calculate the parties' damages. As this cause has an intricate factual matrix, we will rely extensively on the recitations issued in previous opinions in this matter.

[6] During his first term, Governor Mitch Daniels announced that Indiana's welfare system was "broken" and "plagued by high error rates, fraud, wasted dollars, poor conditions for its employees, and very poor service to its clients." *State v. IBM*, 51 N.E.3d 150, 153 (Ind. 2016). Governor Daniels called it "America's worst welfare system." *Id*. The seeds of an overhaul and modernization of the system were sown shortly after Governor Daniels and senior officials began developing the concept of a welfare eligibility upgrade based on a remote eligibility model similar to the one previously instituted in Texas. This new system would allow Indiana citizens to apply for welfare

benefits "via web and call center" without the need for face-to-face meetings with a case worker, and eligibility determinations would be done on a centralized, statewide basis rather than in local county welfare offices. *Id.*

[7] The State commenced the outsourcing process by publishing a Request for Information 6-C (RFI) in 2005, followed by a Request for Proposal 6-58 (RFP) in early 2006, seeking input and recommendations from vendors to improve the distribution of welfare resources. IBM submitted proposals as requested by the RFP, which designated IBM as the prime contractor while working with several subcontractors for operational and subject matter expertise, known as the IBM Coalition.

[8] On December 27, 2006, after months of negotiations, the State and IBM entered into a ten-year, $1.3 billion Master Services Agreement (MSA) in an effort to modernize and improve Indiana's welfare eligibility system. The MSA is detailed, comprehensive, and contains more than 160 pages plus extensive attachments, including 10 exhibits, 24 schedules, and 10 appendices, encompassing all aspects of the parties' working relationship. "[T]he MSA intended to establish centralized service and call centers for the processing of welfare applications, enable remote electronic access to the system, provide the State a paperless document system, create systems to combat fraud and improve Indiana's poor welfare-to-work record and lower administrative costs." *Id.* To that end, the MSA set forth the various overarching "Policy Objectives" for the modernization effort, which include, in pertinent part:

(i) to provide efficient, accurate and timely eligibility
determinations for individuals and families who qualify for
public assistance, (ii) to improve the availability, quality and
reliability of the services being provided to Clients by expanding
access to such services, decreasing inconvenience and improving
response time, among other improvements, (iii) to assist and
support Clients through programs that foster personal
responsibility, independence and social and economic self-
sufficiency, (iv) to assure compliance with all relevant Laws, (v)
to assure the protection and integrity of Personal Information
gathered in connection with eligibility determination, and (vi) to
foster the development of policies and procedures that underscore
the importance of accuracy in eligibility determinations, caseload
integrity across all areas of public assistance and work and work-
related experience for Clients in the Programs.

(Appellant's App. Vol. V, p. 21). The MSA also provides that when construing

and interpreting contractual provisions and terms, "[i]n the event of any

uncertainties" or in the event of any "ambiguity, vagueness, or inconsistency"

the "provisions and terms shall be read in a manner consistent with the Policy

Objectives." (Appellant's App. Vol. V, p. 24). However, the MSA cautions

that:

[n]otwithstanding the foregoing, in no event shall the Policy
Objectives change or expand [IBM]'s obligations hereunder
unless expressly agreed to by the Parties pursuant to a Change.

(Appellant's App. Vol. V, p. 25).

[9] Pursuant to the terms of the MSA, IBM's first obligation was to assist the State

in processing applications under the State's existing procedures in all Indiana

counties. Then, the Modernized system was to be rolled out in phases on a

region-by-region basis according to a "preliminary," "initial Transition Timeline." (Appellant's App. Vol. V, p. 29). Finally, once Modernization was in place in all counties, the project would reach the final stage, "Steady State." *IBM*, 51 N.E.3d at 154. The MSA set forth various standards and measurements to assess IBM's performance through the different project stages. Throughout Modernization, the State retained the right to make operational decisions and kept control over all policy-making authority.

[10] Once IBM began to roll out the Modernized version to the 12-county pilot area, the parties immediately noticed implementation issues. Despite these challenges, the State approved rolling out the project to additional Indiana counties. Other disasters also impacted the rollout of Modernization. First, after the rollout to the pilot region, Indiana was faced with the Great Recession, and the State unemployment rate more than doubled. Because of this, benefit applications increased dramatically. Second, Indiana was hit with a series of natural disasters beginning in 2008. As a result, the parties mutually agreed to suspend rollout of Modernization to accommodate disaster relief efforts. The State expanded the scope of IBM's work 11 times during the course of the project. As such, in 2007, the State added a Healthy Indiana Plan (HIP) to provide insurance to uninsured Hoosiers below a certain income level. The volume of HIP applications far exceeded the State's initial projections, causing IBM to fall further behind in application processing.

[11] Despite the State's initial positive feedback of IBM's implementation of Modernization, in March 2009, Family and Social Services Administration

(FSSA) Secretary, Anne Murphy (Secretary Murphy), requested a formal corrective action plan from IBM to address 36 enumerated issues. After IBM conducted its own assessment, both parties agreed on a corrective action plan which included both short and long-term goals. Even though IBM made some improvements in technology and staffing requirements, the overall scope and services of Modernization did not improve. In September of 2009, the State decided to change its approach and adopted a Hybrid version to welfare Modernization, referred to as "Plan B." *IBM*, 51 N.E.3d at 157. Plan B called for a move away from the Centralized Call Center and brought eligibility determinations back to the local office, as well as an increase of face-to-face contact between clients and staff. While the State initially sought IBM's services to implement Plan B, the parties did not reach an agreement regarding the price of the services and no change order was executed.

[12] On October 15, 2009, Secretary Murphy notified IBM that the State was terminating the MSA for cause, effective December 14, 2009, and asserted that IBM's series of breaches were material considering the MSA as a whole and were not curable within 30 days. Following the termination, the State implemented the Hybrid approach that retained the majority of the Coalition's subcontractors, but replaced IBM with the State as the general contractor.

[13] On May 13, 2010, the State filed a Complaint for damages and declaratory relief against IBM, seeking over $170 million in damages. The same day, IBM filed a Complaint against the State, demanding damages in excess of $52 million. Although the two filings initially proceeded under different Cause

Numbers, the trial court consolidated both Causes. After filing and deciding numerous motions for summary judgment, the matter proceeded to a six-week bench trial, Judge Dreyer presiding. In its 65-page findings of fact and conclusions thereon, the trial court determined, among other items, that the State had failed to prove that IBM materially breached the MSA and found that IBM had substantially performed the MSA. The trial court awarded $49.5 million to IBM in past-due fees that the State was required to pay pursuant to the MSA. This award included $9.5 million in equipment fees for the IBM-owned computer equipment the State kept after terminating the MSA and $40 million in subcontractor assignment fees, which were contractually required payments owed to IBM as a result of the State's decision to purchase IBM's interest in its contracts with certain IBM subcontractors.

[14] On appeal, this court's majority opinion reversed the trial court on the material breach issue, finding that IBM had materially breached the MSA. *See State ex rel. Indiana Family & Soc. Servs. Admin. v. Int'l Bus. Machines Corp.*, 4 N.E.3d 696, 702 (Ind. Ct. App. 2014), *vacated in part*. The appellate majority looked to the Policy Objectives to define the essence of the contract and found that the MSA intended "to provide and expand access to services for welfare recipients in a timely, reliable and efficient manner" while remaining within federal guidelines, reducing fraud and increasing work-participation rates. *Id.* at 718. It concluded that IBM had failed to do so. *Id.* at 728. However, the court of appeals unanimously affirmed the trial court's award of $49.5 million to IBM for equipment fees and subcontractor assignment fees. *Id.* at 747.

[15] The parties each filed cross-petitions to transfer on several issues, including whether IBM materially breached the MSA, whether IBM was entitled to deferred fees for costs incurred during the project, and whether IBM was entitled to assignment fees for the State assuming IBM's subcontracts. The Indiana Supreme Court granted transfer on those petitions. Addressing the question of the material breach, our supreme court held that IBM materially breached the MSA. *See IBM*, 51 N.E.3d at 158. However, like the court of appeals before it, the supreme court affirmed the trial court's $49.5 million award to IBM. It then remanded to the trial court to determine the amount of fees IBM would be entitled to for Change Orders 119 and 133 and for calculation of the parties' damages, including any appropriate offsets to the State as a result of IBM's material breach of the MSA. *See id* at 168-69. Shortly thereafter, the State and IBM stipulated to the entry of a judgment on Change Orders 119 and 133 in favor of IBM and against the State in the amount of $311,096 with post-judgment interest to be determined by the trial court under Indiana law. The parties agreed that the amount of the Change Orders would be entered by the trial court at the time the court ruled on IBM's request for post-judgment interest and the State's claim for damages.

[16] Upon remand, the trial court, presided over by Judge Dreyer, considered the issue of the State's claimed damages and, on May 6, 2016, found that the State was not entitled to any damages from IBM's material breach. That same day, the State moved for a change of judge under Indiana Trial Rule 76(C)(3) and sought a writ with the supreme court, compelling the trial court to vacate all

orders issued in the case since certification of the supreme court's decision. On July 5, 2016, the supreme court ordered the trial court to grant the State's petition for a new judge and "to vacate all orders issued in the underlying case on or after May 6, 2016." *State v. Marion Superior Court*, 54 N.E.2d 995, 995 (Ind. 2016).

[17] Revisiting the issue of damages, the trial court, presided over by Judge Welch, found that it was not bound by the prior trial court's findings of fact and conclusions thereon issued after the six-week bench trial. After extensive review, a full-day hearing, and post-hearing submissions, the trial court entered its very detailed and extensive Order, covering 83 pages and including 387 findings of fact and conclusions thereon. The trial court awarded the State $125 million in direct damages on its breach of contract claim, based largely on the costs the State incurred by implementing Hybrid after terminating Modernization pursuant to the MSA, and $3 million in consequential damages. The court denied IBM's request for post-judgment interest on its $49.5 million award. Offsetting the State's pre-interest liability to IBM, the trial court entered a final judgment, ordering IBM to pay the State more than $78 million.

## DISCUSSION AND DECISION

### I. *Law of the Case*

[18] As a first and overarching procedural argument, IBM posits that the trial court, presided over by J. Welch, erred in setting aside the factual findings in Judge Dreyer's extensive 65-page opinion in which Judge Dreyer found no material

breach after the original six-week trial. IBM maintains that the supreme court accepted these findings and only held that the trial court had applied the wrong legal test to those facts. Accordingly, IBM contends that the supreme court's holding, including its affirmance of the $49.5 million award to IBM, and its subsequent limited remand to calculate damages did not nullify Judge Dreyer's factual findings that Modernization and Hybrid were materially different. As Judge Dreyer's initial findings must stand, and the trial court could not set aside these factual findings, the entire damages award "requires vacatur." (Appellant's Br. p. 24).

[19] In support of its argument, IBM relies on *Greater Clark Cty. Sch. Corp. v. Myers*, 493 N.E.2d 1267 (Ind. Ct. App. 1986). In *Greater Clark*, the school board terminated Myer's employment without first obtaining the statutorily required recommendation of the school superintendent. *Id*. at 1268. On appeal, we concluded that Myers had been wrongfully terminated, reversed the trial court's judgment, and remanded to the trial court for determination of damages. *Id*. During the hearing on remand, Greater Clark argued that because the judgment was reversed on appeal, "the judgment was voided and the parties were returned to their original positions. Thus, Greater Clark opine[d], the merits of Myers's termination were relevant to the issue of damages." *Id*. at 1270. The court of appeals disagreed. Noting that "[t]he reversal and remand for determination of Myers's damages necessarily implied the entry of judgment in favor of Myers by the [c]ourt of [a]ppeals, an action within its inherent authority," this court affirmed the trial court's decision that the only issue

before it on remand was the amount of damages. *Id.* IBM asserts that *Greater Clark* stands for the proposition that "while a complete reversal typically nullifies the trial court's opinion, a reversal coupled with a limited remand for calculation of damages implies that the reviewing court decided certain facts that bind the parties as law of the case." (Appellant's Br. p. 30). Accordingly, IBM maintains that because the supreme court embraced Judge Dreyer's factual findings, the decision below must be vacated and remanded with instructions to adhere to the factual findings entered after the bench trial. We disagree.

[20] Facts determined at one stage of a proceeding, which were part of an issue on which judgment was entered and appeal taken, are unalterably and finally established as part of the law of the case and may not be relitigated at a subsequent stage. *St. Margaret Mercy Healthcare Ctr., Inc. v. Ho*, 663 N.E.2d 1220, 1222 (Ind. Ct. App. 1996). Even if the judgment is erroneous, it nevertheless becomes the law of the case and thereafter binds the parties unless successfully challenged on appeal. *Certain Northeast Annexation Area Landowners v. City of Fort Wayne*, 622 N.E.2d 548, 549 (Ind. Ct. App. 1993), *reh'g denied, trans. denied*. All issues decided directly or by implication in a prior decision are binding in all further portions of the same case. *Am. Family Mut. Ins. Co. v. Federated Mut. Ins. Co.*, 800 N.E.2d 1015, 1019 (Ind. Ct. App. 2004) (*American Family II*). The doctrine does not foreclose legitimate appeals of issues not previously decided, but is invoked in the interests of judicial economy and prompt dispensation of

justice to preclude the promotion of potentially endless litigation and appeals. *Id*. at 1019.

[21] In *Am. Family Mut. Ins. Co. v. Federated Mut. Ins. Co.*, 775 N.E.2d 1198, 1206 (Ind. Ct. App. 2002) (*American Family I*), we specifically found that "Federated's policy attempting to exclude the Browns from uninsured motorist coverage because they are not directors, officers, partners, and owners of the named insured is void[,]" and that "Federated failed to produce evidence that Allied expressly waived this statutory requirement in writing." We also stated that failure to obtain written rejection of uninsured motorist coverage will require an insurer to provide uninsured motorist coverage equal to bodily injury liability limits, and there had been no written rejection of full-liability limits of uninsured motorist coverage by Allied. *Id*. Therefore, we unequivocally ordered Federated to provide uninsured motorist coverage. *Id*. at 1207.

[22] On remand, Federated filed an amended exhibit list, including a document which indicated that there had been a waiver. *American Family II*, 800 N.E.2d at 1018. This document had not been included in the material on which Federated relied for summary judgment in the first appeal, but American Family had raised the lack of a written waiver as an issue in its cross-motion for summary judgment in the first appeal. *Id*. at 1019. The trial court denied American Family's motion to strike the exhibit and granted Federated's motion for summary judgment. *Id*. On appeal after remand, we distinguished decisions where we declined to invoke the law of the case doctrine when additional or new evidence was presented after remand "where the evidence

after remand was in accordance with our instructions or did not alter a matter that had already been finally determined." *Id*. at 1021. Contrasting this case law with *American Family I*, we noted that "[o]ur multifaceted approach—on statutory, public policy, contract, and evidentiary grounds to the broad issue [of] whether Federated was required to provide uninsured motorist coverage for the Browns, left no gap to be filled by the presentation of additional evidence on remand." *Id*. Even if one aspect "was arguably wrongly decided due to Federated's failure to present all the evidence on the issue, that issue was nonetheless finally determined on the merits." *Id*. Accordingly, as the issue had been "decided directly" on the merits, we reversed the trial court's decision. *Id*. at 1022.

[23] Deciding whether the factual determination on Modernization and Hybrid are part of the law of the case and binding upon us, we note that although the supreme court mentioned and explained Modernization versus Hybrid in its Facts section, in its Discussion section, the supreme court was silent on Hybrid and merely analyzed how the problems with Modernization led to the termination of the MSA and to the determination of a material breach. *See IBM*, 51 N.E.2d 150. The court held in its Conclusion, in pertinent part, as follows:

> Because IBM failed to perform satisfactorily as determined by the State (and by its own admission), consistently failed to meet certain timeliness metrics, and failed to assist the State in achieving its Policy Objectives, we hold that IBM did materially breach the MSA through its collective breaches in light of the MSA as a whole. We therefore reverse the trial court's finding

that IBM did not materially breach the MSA. We summarily affirm the [c]ourt of [a]ppeals on all other issues including: affirming the trial court's award of $40 million in assignment fees and $9,510,795 in equipment fees to IBM, affirming the trial court's denial of deferred fees to IBM, and reversing the trial court's award of $2,570,621 in early termination close out payments and $10,632,333 in prejudgment interest to IBM. We also remand the case to the trial court to determine the amount of fees IBM is entitled to for Change Orders 119 and 133, and for calculation of the parties' damages consistent with this opinion, including any appropriate offsets to the State as a result of IBM's material breach of the MSA.

*Id*. at 168-69. Accordingly, as the supreme court ultimately and decidedly established the issue of material breach, it remanded for the calculation of the parties' damages. In reaching its conclusion that IBM had breached the MSA, the supreme court did not touch on whether Hybrid was a continuance of Modernization or a completely different system. As such, a gap needed to be filled by the presentation of additional evidence on damages before the trial court on remand. *See American Family II*, 800 N.E.2d at 1021. Because the evidence after remand was in accordance with the supreme court's instructions and did not alter the issue of material breach that became quintessentially the law of the case, the parties were free to litigate the possible distinction between Modernization and Hybrid as it related to the calculation of the State's damages. *See id*. at 1021.

## II. *Damages Resulting From Hybrid*

Acknowledging that the State is entitled to obtain damages for the benefit of its bargain under the MSA, IBM limits the State's scope of damages to damages resulting from Modernization. However, as the overwhelming majority of damages awarded by the trial court were costs derived from the implementation of Hybrid, IBM maintains that those costs are not recoverable under the MSA because Hybrid differs in material and critical respects from the contracted-for Modernization.

### A. *Standard of Review*

Our review of a damages reward is limited. *Hooker v. Norbu*, 899 N.E.2d 366, 658 (Ind. Ct. App. 2008). We neither reweigh the evidence nor judge the credibility of witnesses, and will reverse an award only when it is not within the scope of the evidence for the factfinder. *Id.* We review questions of law *de novo*. *Id.*

Furthermore, the trial court issued findings of fact and conclusions of law pursuant to Indiana Trial Rule 52. Trial Rule 52(A) provides that on appeal of claims tried to the bench, "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Woodsmall v. Lost Creek Tp. Conservation Club, Inc.*, 933 N.E.2d 899, 902 (Ind. Ct. App. 2010), *trans. denied*.

### B. *Hybrid vs Modernization*

[27] IBM's main substantive contention revolves around the trial court's determination that the costs derived from Hybrid, which was implemented by the State after terminating the MSA, was not a fundamental departure from Modernization and thus could be recovered as direct damages.

[28] The measure of damages in a breach of contract case is the loss actually suffered by the breach. *Dana Companies, LLC v. Chaffee Rentals*, 1 N.E.3d 738, 748 (Ind. Ct. App. 2013), *trans. denied*. To recover under a breach of contract claim, the State must show that its damages flowed directly and naturally from the breach. *See id*. Although no particular degree of certainty is required in awarding damages, the award must be within the scope of the evidence. *Id*. Damages may not be awarded on guess or speculation, but must be ascertainable with reasonable certainty. *Id*. "Consequential damages may be awarded on a breach of contract claim when the non-breaching party's loss flows naturally and probably from the breach and was contemplated by the parties when the contract was made and are generally limited to reasonably foreseeable economic losses." *Berkel & Co. Contractors, Inc. v. Palm & Associates, Inc.*, 814 N.E.2d 649, 658-59 (Ind. Ct. App. 2004).

[29] In support of its argument that Modernization and Hybrid are two distinct systems, IBM focuses on what it characterizes as the three core features: (1) Hybrid moved away from the Central Call Center envisioned by Modernization and moved eligibility determinations back to the local office, while renewing the focus on face-to-face contact; (2) Hybrid abandoned the task-based processing of Modernization and returned to the case-based model; and (3) in

its renegotiation with subcontractors, the State changed their scope of work to fit the scope of work required to implement Hybrid.

[30] When the State first sought to modernize its welfare services delivery system, it published in its RFI that the FSAA "is not specific how Respondents might propose to build and manage a solution to realize a vision. The process is designed to take best advantage of Respondent's [sic] expertise in realizing similar visions in other states and related challenges in the commercial section." (Appellant's App. Vol. IV, p. 32). Accordingly, "while this RFI mentions potential solution components in several areas, none is offered as a requirement. FSSA is looking to Respondents to describe how they would provide the scope of services." (Appellant's App. Vol. IV, p. 31).

[31] What IBM now characterizes as unique, Hybrid features were promised from the outset in IBM's Response to the State's RFI. In both narrative form and diagram, IBM assured the State that face-to-face assistance for welfare applications was part of IBM's proposed solution. IBM clarified that "[w]hile their frequency may decrease with these additional access venues, face-to-face contact is still an important need for some clients. Local offices provide a setting for those clients who simply want to sit down with someone for one-on-one guidance and support." (Appellant's App. Vol. III, p. 154). Prior to entering the MSA, the inter-agency Review Committee, appointed by the State to review IBM's Response to the RFI, suggested some revisions to Modernization to foster its success. One of these revisions was the requirement that Modernization maintain at least one office in every county to "allow

clients to apply for benefits in person as they have always done." (Appellant's App. Vol. IV, p. 89).

[32] Turning to the Policy Objectives of the MSA, we note that the contract fails to refer to the core features now relied upon by IBM. Instead, the Objectives require that IBM's Modernization "improve the availability, quality, and reliability of the services being provided to Clients by expanding access to such services." (Appellant's App. III, p. 152). Schedule 3, incorporated into the MSA and detailing the Vendor Services Environment, confirms that the Hybrid features which IBM describes as a departure from Modernization were part of IBM's initially defined obligation. Specifically, Schedule 3 included in IBM's service delivery model "the use of face-to-face customer service with enabling technologies to allow the Client the freedom to choose the initial and continuing methods of access which best meets their needs." (Appellant's App. Vol. VI, p. 5). It elaborates that IBM will establish a "Help Center" in each county where Clients can meet directly with a service provider." (Appellant's App. Vol. VI, p. 6). Schedule 3 does not advance a Centralized Call Center as a Modernization requirement, but a different solution accomplishing the same objectives was not precluded by the Schedule.

[33] Based on the substantial evidence before us, IBM's attempt to immunize itself from the consequences of its material breach by claiming a fundamental distinction between Modernization and Hybrid is unpersuasive. It is evident that face-to-face client services were envisioned from the inception of Modernization and have always been available from the beginning of the

State's modernization of its welfare services. Only after the system of in-person services was found to be inefficient during Modernization did the State request IBM to review and rework it for Hybrid. The State's decision to eliminate the Centralized Call Center instituted during Modernization does not remove Hybrid from the scope and objectives of the MSA. Nowhere does Schedule 3 mention that a Centralized Call Center was a Modernization requirement or that a different solution accomplishing the same objective is prohibited. Even though the Centralized Call Center as run by IBM was eliminated due to its inefficient performance, its original structure and purpose continue in Hybrid, and are now combined with a remote eligibility application process. Furthermore, evidence reflects that the State still processes applications through tasks, Hybrid just routes these tasks differently. Most telling is the testimony in the record of Deputy Director Roger Zimmerman, the State's architect of Hybrid, during the six-week bench trial, reiterating that Hybrid "required going through [M]odernization to get there." (Appellant's App. Vol. III, p. 42). Accordingly, we conclude that Hybrid fits the scope, objectives, and requirements of the MSA and implements a working version of Modernization. Therefore, costs incurred to implement Hybrid are recoverable as damages due to IBM's material breach of the MSA.

*C. Damages*

[34] In addition to the overall statement that costs incurred as a result of Hybrid are not recoverable as damages under the MSA, IBM also contends that certain

specific categories of Hybrid-related damages should not have been awarded to the State.

[35]     The trial court characterized the State's costs derived from the implementation of Hybrid as Reprocurement Costs (and thus direct damages) based on its definition in the MSA. Reprocurement Costs are recoverable under the MSA, when:

> In the event of a Termination pursuant to Section 16.3.1 (Termination for Cause) . . ., reasonable costs and expenses incurred by the State to bring the applicable terminated Services in-house or to procure services similar to the applicable terminated Services from an alternate source to the extent such costs and expenses would not have otherwise been incurred by the State but for the Termination, including:
>
> (i)     The cost differential between the Fees paid under this Agreement and the replacement costs of such Services from another contractor,
>
> (ii)    Administrative costs and expenses reasonably necessary to replace the applicable terminated portion of this Agreement, including the costs and expenses of competitive bidding, mailing, advertising, applicable fees, charges, staff time costs and costs and expenses of external advisors, consultants and attorneys to assist with such procurement, and
>
> (iii)   Other reasonable costs necessary to such procurement or insourcing.

(Appellant's App. Vol. III, p. 137).

[36] Contending that the trial court erred by awarding the State over $103 million for the increased cost of subcontractors, IBM asserts that this damage award would place the State in a better position than before the breach because it is charging IBM for a different and more expensive system than the parties contracted for. First, we already determined that Modernization and Hybrid are essentially the same systems, albeit under a different name. The State contracted with IBM to build a Modernized welfare system, which it failed to do. The State stepped in, contracted with the same subcontractors IBM had previously entered into subcontracts with, and built its system in accordance with the Hybrid specifics. Because these costs "flowed directly and naturally" from IBM's breach of the MSA, and the services procured by the State were similar to the applicable terminated services, IBM is responsible for this increased cost. *See Dana Companies, LLC*, 1 N.E.3d at 748.

[37] In a similar vein, IBM disputes the trial court's award of $22.5 million damages, including the $9.7 million for hardware and software maintenance costs, $4.1 million in overtime pay, $3.7 million in new lease costs, and "millions more in consulting fees." (Appellant's Br. p. 47). IBM contends that these damages do not result from losses caused by its own conduct. Again, we disagree. The renewed attention on the face-to-face customer service in Hybrid caused the State to reallocate more resources to the local offices to alleviate the problems resulting from the previously understaffed local offices under Modernization. These numbers merely represent "reasonable costs associated with bringing a similar service in-house" and are included in the "administrative costs and

expenses reasonably necessary to replace the applicable terminated portion of” the MSA. (Appellant’s App. Vol. III, p. 137). Consequently, we affirm the trial court’s damage award.

### III. *Post-Judgment Interest*

[38] In its final argument, IBM contends that the trial court erred by not awarding it post-judgment interest on its $49.5 million damages award entered by Judge Dreyer in its July 18, 2012 Order.

[39] The right to post-judgment interest arises as a matter of statutory law. *Tincher v. Davidson*, 784 N.E.2d 551, 553 (Ind. Ct. App. 2003). Under Indiana law, a person awarded a monetary judgment against the State is entitled to post-judgment interest that accrues until the judgment is paid. I.C. § 34-13-1-6. However, “an execution shall not issue but the judgment shall draw interest at an annual rate of six percent (6%) from the date of the adjournment of the next ensuing session of the general assembly until an appropriation is made by law for the payment and the judgment is paid.” I.C. § 34-13-1-6.

[40] “If a judgment is reversed on appeal and remanded to the trial court for the entry of a new judgment, post-judgment interest accrues from the date the trial court enters the new judgment.” *Beam*, 765 N.E.2d at 534. In *Beam*, the parties stipulated at trial that the jury would assess liability for an automobile accident and determine the damages, while the trial court would calculate the propriety of setoffs that Beam received from other sources. *Id*. at 527. After the jury returned its verdict, the trial court reduced the damages by the entire amount of

Beam's worker's compensation benefits, even though he had only been assessed 45% at fault. *Id*. On appeal, our supreme court determined that the trial court should have only reduced the jury verdict by 55%, and not 100%, of the worker's compensation benefits amount that Beam already received. *Id*. at 533-34. In doing so, the supreme court determined that it was not reversing the trial court's judgment but rather modifying the jury's verdict. *Id*. at 534. Citing I.C. § 24-4.6-1-101, our supreme court concluded that post-judgment interest on a modified award should run from the date of the original verdict and not from the date that the verdict was modified. *Id*. at 534-35. The supreme court added that when a judgment has been reversed on appeal and remanded for entry of a new judgment, then the post-judgment interest on the new judgment would begin to accrue from the date the trial court enters the new judgment. *Id*. at 534.

[41] Judge Dreyer's first Order, issued on July 18, 2012, decided:

> 148. Trial judgment entered for IBM and against the State on IBM's Complaint in the amount of [$12,081,416]. Previous summary judgment is reiterated in the amount of [$40] million. Final judgment amount totals [$50,081,416] plus prejudgment interest and costs.

> 149. Judgment entered for IBM and against the State on the State's Complaint, and the State takes nothing.

(Appellant's App. Vol. III, p. 66).

[42] On February 13, 2014, this court

Affirm[ed] the trial court's award of $40 million in assignment fees and $9,510,795 in Equipment fees to IBM, affirm[ed] the trial court's denial of Deferred Fees to IBM, reverse[d] the trial court's award of $2,570,621 in Early Termination Close Out Payments and $10,632,333 in prejudgment interest to IBM, and remand[ed] the case to the trial court to determine the amount of fees IBM is entitled to for Change Orders 119 and 133 and to determine the State's damages and offset any damages awarded to IBM as a result of IBM's material breach of the contract.

*State v. IBM*, 4 N.E.3d 696, 747 (Ind. Ct. App. 2014), *vacated in part.*

[43]     After granting transfer, our supreme court concluded on March 22, 2016,

We therefore reverse the trial court's finding that IBM did not materially breach the MSA. We summarily affirm the [c]ourt of [a]ppeals on all other issues including: affirming the trial court's award of $40 million in assignment fees and $9,510,795 in equipment fees to IBM, affirming the trial court's denial of deferred fees to IBM, and reversing the trial court's award of $2,570,621 in early termination close out payments and $10,632,333 in prejudgment interest to IBM. We also remand the case to the trial court to determine the amount of fees IBM is entitled to for Change Orders 119 and 133, and for calculation of the parties' damages consistent with this opinion, including any appropriate offsets to the State as a result of IBM's material breach of the MSA.

*State v. IBM*, 51 N.E.3d at 168-69.

[44]     Judge Dreyer, upon remand from the supreme court, issued his "Order upon Remand Regarding State's Damages," on May 6, 2016, and ruled that "the evidence shows that all of the costs for which the State seeks reimbursement

were not adequately proven and thus cannot be recovered as damages." (Appellant's App. Vol. III, p. 98) (footnotes omitted). The court held that "the State fail[ed] to prove damages to a reasonable certainty." (Appellant's App. Vol. III, p. 98). In response to Judge Dreyer's damages award, the supreme court, on July 5, 2016, decided that "[t]he Respondents, the Marion Superior Court and [Judge Dreyer] are ordered to vacate all orders issued in the underlying case on or after May 6, 2016, and to grant the change of judge." *State v. Marion Superior Court*, 54 N.E.3d 995 (Ind. 2016). After that, the current trial court, presided over by Judge Welch, issued the contested Order which is now before us. In her order, Judge Welch ruled:

> 384. In this case, the plain language of the prior trial court's [order] stated that 'judgment was entered for IBM and against the State.' The Indiana Supreme Court reversed the trial court's [] judgment on the State's breach of contract claim by holding that IBM materially breached the MSA. In conclusion, the [s]upreme [c]ourt ordered this [c]ourt to calculate the parties' damages and any appropriate offsets which are contained in the MSA, which this [c]ourt takes to mean the equipment, assignment fees, and change order damages owed to IBM.

> 385. Therefore, this [c]ourt finds that the trial court judgment in favor of IBM was reversed, and thus, under Indiana law, IBM is not entitled to post-judgment interest from the date of the prior trial court's judgment entry for IBM in 2012 but rather is only entitled to post-judgment interest from the date of this judgment after this [c]ourt has conducted the offset as required by the MSA and as instructed by the Indiana Supreme Court.

(Appellant's App. Vol. III, p. 176). Judge Welch again awarded IBM $40 million in assignment fees and $9,510,795 in equipment fees.

[45] This review of the convoluted proceedings clearly indicates that since Judge Dreyer's first Order of July 18, 2012, the one constant in this case has been IBM's award of assignment and equipment fees upon IBM's Complaint[2] against the State. Although the State challenged those awards on appeal, both this court and the supreme court expressly affirmed that portion of the judgment on the combined Complaints. More specifically, unlike Judge Welch's opinion that interpreted the supreme court's opinion of March 22, 2016, as a complete reversal of the lower court, we find that the Indiana Supreme Court unequivocally "summarily affirmed the [c]ourt of [a]ppeals [on] the trial court's award of $40 million in assignment fees and $9,510,795 in equipment fees to IBM." *IBM*, 51 N.E.3d at 168. Accordingly, as no appellate decision reversed IBM's judgment on its Complaint, IBM is entitled to post-judgment interest "from the date of the original verdict." *See Beam*, 765 N.E.2d at 534. We therefore reverse the trial court and remand for calculation of the post-judgment interest award entered on July 18, 2012.

## CROSS-APPEAL

[2] IBM's Complaint originally proceeded under its own cause number and separate from the State's Complaint. In its Complaint, IBM demanded damages in excess of $52 million, which included damages for assignment and equipment fees. Although the two filings initially proceeded under different Cause Numbers, the trial court consolidated both Causes and issued one single opinion, ruling on both the State's and IBM's Complaint.

## I. *Direct Damages Cap*

On Cross-Appeal, the State contends that the trial court incorrectly applied the direct damages cap of the MSA. In its Order, the trial court noted that "the MSA caps damages to the State at $125 million for direct damages and $3 million for consequential damages." (Appellant's App. Vol. III, p. 170).

Referencing the MSA, the State nevertheless contends that §17.4.1(2)(A) provides

> As to direct damages, which shall include Reprocurement Costs, an amount equal to the greater of (i) [$125,000,000] and (ii) the Fees paid by State to Vendor hereunder during the [12] months prior to the most recent Claim [], provided nothing herein shall relieve the State of its obligation to mitigate Reprocurement Costs[.]

(Appellant's App. Vol. V, p. 162). 'Claim' is contractually defined as a "claim, demand, cause of action, debt or liability of any kind, including a claim for expenses and attorney fees." (Appellant's App. Vol. VI, p. 38). Equating 'Claim' to the date of terminating the MSA, the State asserts that evidence was submitted indicating that during the 12-months preceding the October 15, 2009 termination of the MSA, the State paid IBM at least $158 million. Accordingly, focusing on the second prong of §17.4.1(2)(A), the State requests us to increase the applicable direct damages cap to $158 million.

At the time of termination of the MSA, the State notified IBM that its series of breaches would be considered material under the contract and stopped IBM's

services under the MSA. The State failed to submit any evidence supporting that a "demand, cause of action, [or] debt or liability of any kind" was made at that point in time. (Appellant's App. Vol. VI, p. 38). Rather, the evidence supports that the earliest demand for damages was made on May 13, 2010, when the State filed its cause of action against IBM. Accordingly, as the State does not dispute that the fees paid to IBM in the 12-months preceding the date of termination were substantially less than $125 million, the trial court properly limited the direct damages cap at the greater number of $125 million.

## II. *Salaries for New State Employees*

[49] As part of its damages request, the State demanded an additional $36.5 million to cover the salaries of 48 new State eligibility consultants and 50 new management personnel. Denying the State's request, the trial court concluded, in pertinent part:

> 268. This presents an issue of whether these damages are consistent and arising from the breach. The State's position is that had Modernization worked properly, then the staffing reduction would not have caused problems. Because Modernization did not work properly, the State suffered damages by having to rehire Staff.
>
> 269. This [c]ourt finds that such an award would be putting the State in a better position than it was prior to the MSA. The State would essentially receive a windfall from IBM by being paid to return to pre-MSA staffing levels.
>
> 270. While the State was insourcing the program, hiring forty-five new managers falls outside of "reasonable costs associated

with bringing a similar service in-house," and because they are new staff, their costs cannot be considered Reprocurement Costs as the additional hires do not support that the State was installing a new regime "similar to the applicable terminated Services."

271. These workers do not constitute a differential in between the fees paid under the previous Modernization regime and those now under Hybrid because these workers were not around under Modernization.

272. These worker expenses are not reasonable costs to replace a terminated portion of the MSA, and they are not external advisors, consultants, or attorneys assisting with the Reprocurement. While their efforts can loosely be attributed to MSA § 15 "staff time costs," hiring forty-eight full-time employees and additional managers goes well beyond the aims of in-sourcing a program previously provided by IBM and instead constitutes putting the State in a better position than it was prior to the MSA.

(Appellant's App. Vol. III, p. 157).

[50] The State contends that to make the State whole, it did not have to return to the system prior to Modernization; rather, it meant giving "the State the benefit of the MSA bargain—*i.e.*, a Modernized system that worked[.]" (Appellee's Br. p. 48). Claiming to be entitled to be placed in a better position than it was prior to the MSA, the State maintains that this better position was the reason it entered into the MSA; it did not seek a windfall, merely it sought the cost of post-MSA staff required to make Modernization work.

[51]　Generally, the computation of damages for a breach of contract is a matter within the sound discretion of the trial court. *City of Jeffersonville v. Envtl. Mgmt. Corp.*, 954 N.E.2d 1000, 1015 (Ind. Ct. App. 2011). We will not reverse a damage award upon appeal unless it is based on insufficient evidence or is contrary to law. *Id*. In determining whether an award is within the scope of the evidence, we may not reweigh the evidence or judge the credibility of witnesses. *Id*. However, we recognize that the appropriate measure of damages in a breach of contract case is the loss actually suffered as a result of the breach. *Id*. The non-breaching party is not entitled to be placed in a better position than it would have been if the contract had not been broken. *Id*.

[52]　The record contains evidence that the 48 new eligibility employees were hired in the spring of 2009, prior to the termination of the MSA. This additional staff was retained to serve Hoosiers in need in local offices in an effort to make Modernization work and to salvage the project. The State failed to submit any evidence that these costs were incurred due to IBM's breach.

[53]　Unlike the eligibility personnel, the 50 new management positions were created and filled after the termination of the MSA. The State's damages expert explained that the purpose of this hire was to satisfy the State's intent to place "more focus at the local county level, which required more people." (Suppl. App. Vol. II, pp. 7-8). However, the goal of both Modernization and Hybrid was a move away from an increasing face-to face contact by the implementation of technology. While the State recognized that a more efficient level of personal contact between clients and staff had to be retained in its

Hybrid system, the trial court found that—and we agree—the 50 new management positions essentially returned the State to "pre-MSA staffing levels." (Appellant's App. Vol. III, p. 157). As these new positions did not exist under Modernization, their costs cannot constitute a "differential" between the fees paid under the MSA and the replacement cost. (Appellant's App. Vol. III, p. 137). Therefore, the costs of these new positions do not fall within the scope of Reprocurement Costs because they never constituted a "terminated Service[]" that the State needed to substitute from an alternative source after termination of the MSA. (Appellant's App. Vol. III, p. 137). Accordingly, as the State is not entitled to be placed in a better position than it would have been if the MSA had not been breached, we affirm the trial court's conclusion that the salaries for these new State employees cannot be attributed to IBM's breach.

## CONCLUSION

Based on the foregoing, we hold that the trial court did not err in its award of the State's damages. However, we conclude that IBM is entitled to post-judgment interest on its $49.5 million damages award, and we remand to the trial court for calculation of the post-judgment interest.

Affirmed in part, reversed in part, and remanded.

May, J. and Altice, J. concur