

FILED

Oct 10 2019, 4:30 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



# IN THE
# Indiana Supreme Court

Supreme Court Case No. 19S-PL-19

## International Business Machines Corporation,

*Appellant/Cross-Appellee*

(Defendant/Plaintiff below),

–v–

## State of Indiana, acting on behalf of the Indiana Family & Social Services Administration

*Appellee/Cross-Appellant*

(Plaintiff/Defendant below).

---

Argued: February 21, 2019 | Originally Decided: June 26, 2019
Modified on Rehearing: October 10, 2019

Appeal from the Marion Superior Court
No. 49D01-1005-PL-21451

The Honorable Heather A. Welch, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 49A02-1709-PL-2006

---

### Opinion on Rehearing by Justice David

Chief Justice Rush and Justice Goff concur.
Justice Slaughter concurs in part and dissents in part with separate opinion.
Justice Massa not participating.

## David, Justice.

This case comes before our Court for the second time and arises out of a contract entered into between the State of Indiana, acting on behalf of the Family and Social Services Administration, and International Business Machines, Corp. to modernize and improve Indiana's welfare eligibility system. We previously determined that IBM materially breached the contract and remanded the matter to the trial court to determine damages and appropriate offsets. After the submission of evidence and a full-day hearing, the trial court issued detailed findings and conclusions. It determined that damages to the State resulting from the breach totaled $128 million and that IBM was entitled to offsets in the amount of $49,510,795, resulting in a final judgment of $78,178,109 to the State.

Both parties appealed, raising various issues. Today we address one of the issues raised: whether IBM is entitled to post-judgment interest on its $49.5 million damages award running from the date of the original judgment in 2012 or running from the judgment on remand. Finding that the original 2012 judgment was not "final," we hold that the post-judgment interest due to IBM runs from the judgment on remand. We summarily affirm the Court of Appeals on all other issues and affirm the trial court on all issues.

## Facts and Procedural History

As this Court explained in *State v. International Business Machines Corp.*, 51 N.E.3d 150, 152 (Ind. 2016) ("IBM I"):

> This case involves a $1.3 billion Master Services Agreement
> ("MSA") entered into between the State of Indiana, acting on
> behalf of the Family and Social Services Administration
> ("State") and International Business Machines, Corp. ("IBM")
> to modernize and improve Indiana's welfare eligibility system.
> Although the MSA was supposed to last ten years, the State

terminated it less than three years in, citing performance issues on the part of IBM. Both parties sued each other for breach of contract.

After a six-week bench trial, the Marion Superior Court found that the State failed to prove that IBM's breach of the MSA was material and awarded IBM damages for assignment and equipment fees. It also awarded termination payments and pre-judgment interest. Both parties appealed. Ultimately, this Court reversed, in part, holding that IBM materially breached the MSA. We reversed IBM's termination payment and pre-judgment interest awards, but affirmed its assignment and equipment fees in the amount of $49,510,795. We remanded to the trial court with the following instructions:

> [W]e hold that IBM did materially breach the MSA through its collective breaches in light of the MSA as [a] whole. We therefore reverse the trial court's finding that IBM did not materially breach the MSA. We summarily affirm the Court of Appeals on all other issues including: affirming the trial court's award of $40 million in assignment fees and $9,510,795 in equipment fees to IBM, affirming the trial court's denial of deferred fees to IBM, and reversing the trial court's award of $2,570,621 in early termination close out payments and $10,632,333 in prejudgment interest to IBM. We also remand the case to the trial court to determine the amount of fees IBM is entitled to for Change Orders 119 and 133, and for calculation of the parties' damages consistent with this opinion, including any appropriate offsets to the State as a result of IBM's material breach of the MSA.

*Id.* at 168-169.

On remand, the trial court held a full-day hearing and considered both pre-hearing briefs and post-hearing submissions. It issued an 83-page order awarding the State $128 million in damages and credited IBM $49,510,795 for assignment and equipment fees this Court upheld plus the

amount of fees for the change orders (an amount agreed to via stipulation of the parties). The trial court denied IBM's request for post-judgment interest on the $49.5 million-dollar award for assignment and equipment fees. Thus, IBM was ordered to pay the State $78.2 million, after offsets.

Both parties again appealed. IBM argued: 1) it is entitled to post-judgment interest on the fees upheld by this Court in IBM I; 2) the trial court erred by setting aside the factual findings of the original trial court; and 3) the trial court erred by holding IBM responsible for the costs of implementing a different and more expensive welfare system than the one contemplated by the MSA. For its part, the State argued it was entitled to additional damages resulting from the breach.

The Court of Appeals affirmed in part, reversed in part, and remanded with instructions. *Int'l Bus. Machines Corp. v. State on behalf of Indiana Family & Soc. Servs. Admin.*, 112 N.E.3d 1088 (Ind. Ct. App. 2018) ("IBM II"). It rejected both of the State's requests for additional damages and concluded that IBM was entitled to post-judgment interest on the $49.5 million damages award that survived IBM I.

Both parties sought transfer. The Indianapolis Bar Association's Appellate Practice Section and the Defense Trial Counsel of Indiana (DTCI) have filed *amici* briefs in support of transfer on the post-judgment interest issue. We granted transfer thereby vacating the Court of Appeals opinion. Ind. Appellate Rule 58(A). We write only to address the post-judgment interest issue. We summarily affirm the other portions of the Court of Appeals opinion and affirm the trial court on all issues.

## Standard of Review

Here, the trial court has made special findings pursuant to Indiana Trial Rule 52(A). As such, a reviewing court may affirm the judgment on any legal theory supported by the findings. *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 234 (Ind. 2001) (citations omitted). Further, [w]hen the specific issue on review relates to the award of damages, a damage award should not be reversed if it is within the scope of the evidence before the trial court." *Id*. (*quoting Dunn v. Cadiente*, 516 N.E.2d 52, 54 (Ind. 1987)).

However, the right to post-judgment interest arises as a matter of statutory law. *Tincher v. Davidson*, 784 N.E.2d 551, 553 (Ind. Ct. App. 2003). The meaning of a statute is a question of law which we review *de novo*. *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016).

# Discussion and Decision

IBM argues that it is entitled to post-judgment interest on its $49.5 million award as entered by the trial court and affirmed by this Court in IBM I. Our Court of Appeals agreed. It applied *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524 (Ind. 2002) and found that the "one constant" in the case was the award of assignment and equipment fees to IBM. *Int'l Bus. Machines Corp.*, 112 N.E.3d at 1103. While it is true that this award has remained unchanged from the original judgment until present, we do not find *Beam* to be applicable to these facts and circumstances.

In *Beam* this Court looked at Indiana Code section 24-4.6-1-101 and addressed whether post-judgment interest on a modified award runs on the amount after modification by the reviewing court or the original amount. *Beam*, 765 N.E.2d at 534. Indiana Code section 24-4.6-1-101 provides that post-judgment interest accrues back to the "date of the return of the verdict or finding of the court until satisfaction. . . ." The operative language in *Beam* is that when:

> a judgment is reversed on appeal and remanded to the trial court for the entry of a new judgment, post-judgment interest accrues from the date the trial court enters the new judgment.

> \* \* \*

> [But] where a money judgment has been modified on appeal and the only action necessary in the trial court is compliance with the mandate of the appellate court, interest on the judgment as modified runs from the date of the original judgment.

*Beam*, 765 N.E.2d at 534-535. (citation omitted).

We found that because we modified the amount of damages but did not reverse judgment for plaintiff, post-judgment interest ran from the date of the original verdict on the modified amount. *Id*. at 534.

But here, it is not Indiana Code section 24-4.6-1-101[1] that governs, but Indiana Code section 34-13-1-6 because we are dealing with a sum of money due from the State. It provides:

> Whenever, by final decree or judgment, a sum of money is adjudged to be due any person from the state, an execution shall not issue but the judgment shall draw interest at an annual rate of six percent (6%) from the date of the adjournment of the next ensuing session of the general assembly until an appropriation is made by law for the payment and the judgment is paid.

The relevant inquiry in *Beam* was whether the judgment was only modified or reversed entirely, and pursuant to the statute, post-judgment interest was due from the "date of the return of the verdict or finding of the court." Ind. Code § 24-4.6-1-101. Here, the relevant inquiry pursuant to Indiana Code section 34-13-1-6 is whether there was a final decree or judgment. A final judgment "disposes of all issues as to all parties thereby ending the particular case." *Georgos v. Jackson*, 790 N.E.2d 448, 451 (Ind. 2003).

At the time of remand, all the issues were not disposed of as this Court's opinion in IBM I did two things: 1) it reversed the trial court on the issue of whether IBM's breach of the MSA was material; and 2) remanded to the trial court to calculate appropriate damages as well as offsets. While IBM wants us to consider its suit against the State separate and apart from State's suit, the two arise out of the same facts and

---

[1] Ind. Code § 24-4.6-1-101 begins with qualifying language that it applies "[e]xcept as otherwise provided by statute. . . ."

circumstances and are inextricably tied.  Case law is clear that a final judgment disposes of "*all* issues as to *all* parties." *Id*. (quoting Indiana Appellate Rule 2(H) (emphasis added).  Not all the issues as to all parties were resolved at the time of remand and further, what was due and owed to IBM was necessarily contingent upon what damages were due the State for the breach.  IBM could have recovered money from the State if the State's damage award was less than what was awarded to IBM or IBM award could have simply been applied to offset what was owed to the State.  In *Beam*, we stated the rationale for awarding post-judgment interest as if the date of the original judgment when it has not been reversed: it "compensates plaintiffs for the loss of money that has been determined to be have rightfully belonged to them throughout the time of the pending appeal."  *Beam*, 765 N.E.2d at 534.  Here, there is no money that rightfully belonged to IBM as the amount awarded to it may have been and ultimately was, only an offset to what IBM owes the State.  Accordingly, looking at the statute, our case law and the facts of this case, post-judgment interest going back to the original judgment is inappropriate.

# Conclusion

We hold that the post-judgment interest due to IBM stems from the judgment on remand.  Under Indiana Code section 34-13-1-6, the judgment "draw[s] interest at an annual rate of six percent (6%) from the date of the adjournment of the next ensuing session of the general assembly…."  Following the judgment in this case on August 4, 2017, the next ensuing session of the General Assembly adjourned on March 14, 2018.  Therefore, the post-judgment interest due to IBM runs from March 14, 2018.  We summarily affirm the Court of Appeals on all other issues and affirm the trial court on all issues.

Rush, C.J., and Goff, J., concur.
Slaughter, J., concurs in part and dissents in part with separate opinion.
Massa, J., not participating.

ATTORNEYS FOR APPELLANT

Jay P. Lefkowitz
Kirkland & Ellis LLP
New York, New York

Paul D. Clement
Kirkland & Ellis LLP
Washington, D.C.

Andrew W. Hull
Laurie E. Martin
Hoover Hull Turner LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Peter J. Rusthoven
John R. Maley
J. Curtis Greene
Meredith Thornburgh White
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE, INDIANAPOLIS BAR ASSOCIATION

Tyler D. Helmond
Voyles Vaiana Lukemeyer Baldwin & Webb
Indianapolis, Indiana

Josh S. Tatum
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

Joel M. Schumm
Indianapolis, Indiana

Bryan H. Babb
Bose McKinney & Evans LLP
Indianapolis, Indiana

Libby Y. Goodknight
Krieg DeVault LLP
Indianapolis, IN

ATTORNEYS FOR AMICUS CURIAE, DEFENSE TRIAL COUNSEL
OF INDIANA

James D. Johnson
Blair M. Gardner
Jackson Kelly PLLC
Evansville, Indiana

**Slaughter, J., concurring in part, dissenting in part.**

The Court summarily affirms an award of $125 million to the State as direct damages resulting from IBM's breach of contract to update Indiana's welfare system. A central premise of the appellate ruling we affirm is that the "Modernization" approach required by the parties' Master Services Agreement is "essentially the same" as the more expensive "Hybrid" approach the State eventually implemented. *IBM v. State*, 112 N.E.3d 1088, 1101 (Ind. Ct. App. 2018), trans. granted. I am unable to join the Court's summary affirmance because the record establishes that the Agreement required IBM to implement only Modernization and not Hybrid. Thus, I would treat the State's additional costs to implement Hybrid not as direct damages subject to a $125-million cap but as consequential damages subject to a $3-million cap. On the separate issue of post-judgment interest, I join the Court.

I.

The State's original plan for updating what then-Governor Mitch Daniels called "America's worst welfare system" was to adopt a "modernized" system based on remote eligibility. *State v. IBM*, 51 N.E.3d 150, 153 (Ind. 2016). Needy Hoosiers would apply for welfare benefits using the internet or accessing a call center without the need for face-to-face meetings with a case worker. *Id.* An applicant's eligibility would then be decided through a centralized process statewide rather than in local county welfare offices. *Id.*

After months of negotiations, in December 2006 the State contracted with IBM to establish Modernization—a centralized system with call centers to process welfare applications. *Id.* This arrangement also would allow remote electronic access to the system, provide a paperless document system, implement tools to lower fraud and improve Indiana's poor welfare-to-work record, and reduce administrative costs. *Id.* The parties' ten-year, billion-dollar-plus Agreement was more than 160 pages long with extensive attachments, including exhibits, schedules, and appendices, addressing all aspects of the parties' business relationship. *Id.* The Agreement also included a change-order procedure by which the

parties could agree for IBM to take on additional work—not required under the original Agreement—for additional pay. *Id*. at 165.

Problems with Modernization arose as soon as the system was first rolled out to a limited pilot area. *Id.* at 155. Some of the problems were attributed to the economic downturn in 2008 as welfare applications increased dramatically. *Id.* And that same year, the State faced a series of natural disasters that also strained the system. *Id.* Throughout the project, the State used the change-order process eleven times to expand the scope of IBM's work under the Agreement. *Id.* at 156. But problems persisted, and in October 2009 the State notified IBM it would be terminating the Agreement for cause effective in December 2009. *Id.* at 157. Just before announcing the termination, the State adopted a "Plan B" approach to welfare modernization—a decentralized model requiring additional personnel and physical space. *Id.*

> [In September 2009], the State decided to change approaches and adopt a hybrid approach to welfare modernization, referred to by the parties as "Plan B." Plan B moved away from the centralized call center and moved eligibility determinations back to the local office, increasing face-to-face contact between clients and staff.

*Id*. The State initially asked IBM to implement its Plan B—"Hybrid"—system via the change-order process, but the parties were unable to agree on the price for IBM to take on these additional services. *Id.* After the termination, the State incurred substantial additional costs associated with implementing Hybrid.

Our initial opinion agreed with the State that IBM had materially breached the Agreement by failing to deliver the Modernization system the State had procured, thus entitling the State to recoup damages resulting from the breach. *Id.* at 168-69. On remand, the trial court awarded $125 million in direct damages for the State's increased costs associated with the transition to Hybrid and an additional $3 million in consequential damages. 112 N.E.3d at 1095. As to damages, the court of

appeals affirmed. *Id*. at 1105-06. And today our Court summarily affirms the court of appeals.

## II.

The Agreement did not require IBM to incur the Hybrid-related costs of renting additional space, hiring additional personnel, and renegotiating subcontracts with subcontractors already under contract to implement Modernization. And the parties' conduct reflects as much. It is telling that the State initially asked IBM to implement Hybrid via change order. By entering into the change-order process, the State all but admits that Hybrid is outside the scope of contracted services. Parties do not negotiate proposed changes to an agreement that already requires those things.

The court of appeals thus erred in treating the State's additional costs to implement Hybrid as "reprocurement costs"—a defined term under the Agreement. Such costs are the "reasonable costs and expenses" the State incurs to "procure services similar to the applicable terminated Services . . . to the extent such costs and expenses would not have otherwise been incurred by the State but for the Termination". The State's post-termination costs of transitioning its welfare-reform system from Modernization to Hybrid were not costs to "**re**procure" anything; the additional Hybrid services had never been "procured" from IBM in the first place. Only Modernization had been procured from IBM, but IBM did not deliver, so it was in material breach. Thus, it was not IBM's breach but the State's decision to switch to the different, more expensive Hybrid system that caused the State to incur these additional expenses. The State's additional, Hybrid-related costs are at most consequential damages, not direct damages.

One result of the court of appeals' ruling is that the State is better off than if IBM had not breached. To be sure, the State is entitled to the benefit of its bargain with IBM. It can recover the damages caused by IBM's breach—*i.e.*, the difference between what IBM had to provide under the Agreement and what IBM actually delivered. But the State is not entitled to a windfall. It cannot recover costs for additional services beyond what the Agreement required. Because I disagree with the court of appeals'

award of damages attributable to IBM's breach, I respectfully dissent from our Court's summary affirmance of that portion of the appellate opinion.

## III.

Finally, though the Court's summary affirmance benefits the State in the short term, the longer-term consequence of our ruling for the State's future procurement efforts may not be so favorable. It will come as little surprise if prospective vendors respond to today's ruling in one of two ways. Either they will not do business with the State at all, thus reducing the supply of those willing to contract with the State. Or they will include a risk premium in their contracts to cover the unknown costs of fulfilling obligations beyond what they agreed to. Either way, the State and its taxpayers may soon learn that the future cost of obtaining third-party services will be higher—perhaps appreciably so—than otherwise. The magnitude of the increased cost may not be knowable, but it is a cost nonetheless.